Amado B. Colón, demandante y apelado, *v.* The Shell Co. (P.R.) Ltd., Plazuela Sugar Co., Inc. y Manuel Sierra, demandados y apelantes.

Núms. 7884, 7720 y 7721.—*Sometidos:* Abril 12, 1939. *Resueltos:* Noviembre 15, 1939.

---

* Nota: Véase el prefacio.

*Jaime Sifre, Jr., Horacio Franceschi* y *Rafael Pastor,* abogados de The Shell Co.; *Orlando J. Antonsanti,* abogado de Plazuela Sugar Co.; *Antonio J. Matta,* abogado del Sr. Sierra; *Susoni, Defendini & Arrache Battistini,* abogados del Sr. Colón.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Se instituyó este pleito en reclamación de los daños y perjuicios que alega el demandante le fueron causados por actos negligentes de los demandados. Las alegaciones esenciales del demandante pueden sintetizarse así:

Que el demandante es condueño de ciertos terrenos y arrendatario de otros, radicados todos en el barrio Tanamá, de Arecibo, que dedica a la siembra y cultivo de la caña de azúcar, crianza y apacentamiento de ganado, y a otras faenas agrícolas. Que además de las actividades mencionadas, el demandante, en la fecha indicada en la demanda, allá para fines de febrero de 1930, así como para la fecha de la radicación de la misma, tenía un contrato con el municipio de

Arecibo a virtud del cual el demandante venía obligado a efectuar la recolección, arrastre y cremación de las basuras de la ciudad.

Que la demandada Plazuela Sugar Co., Inc., en las mismas fechas anteriormente indicadas, se dedicaba a explotar una factoría para la molienda de caña de azúcar, denominada "Central Los Caños", radicada en Arecibo; que por los terrenos donde está establecida dicha central corre un río de escaso caudal y corriente lenta, denominado "Santiago", el cual pasa por los terrenos del demandante.

Que la otra demandada, The Shell Co. (P. R.) Ltd., en las mismas fechas indicadas, era una corporación extranjera que hacía negocios en Puerto Rico y suministraba a la co-demandada Plazuela Sugar Co. combustible (*fuel oil*) que en vagones tanques pertenecientes a la vendedora era conducido por ferrocarril a la Central Los Caños, donde se situaba sobre railes en la vecindad de la factoría, cerca del río Santiago, y de estos vagones tanques los empleados de la factoría valiéndose de una bomba lo trasladaban a sus depósitos.

Que allá para fines de febrero o los primeros días de marzo, 1930, el demandado Manuel Sierra, empleado de Plazuela Sugar Co., recibía el *fuel oil* y lo trasladaba a los depósitos de la factoría, asumiendo el control y vigilancia de los vagones tanques de petróleo una vez entregados por la vendedora.

Que en la fecha anteriormente indicada el *fuel oil* contenido en uno o varios de dichos vagones tanques se escapó de su envase, impregnando y saturando de petróleo el terreno que se extendía entre el vagón tanque y el río Santiago, penetrando en las aguas de éste, y arrastrado por la corriente, llegó hasta los terrenos del demandante antes descritos, continuando su curso hacia adelante. Que en estas aguas así contaminadas abrevó el ganado del demandante, enfermando y muriendo en su mayor parte, a pesar de las gestiones realizadas por él para evitarlo. Que el ganado enfermo que no murió, necesitó medicinas y cuidados espe-

ciales que irrogaron al demandante gastos, molestias y desvelos; perdió en peso el ganado, sufriendo quebrantamiento en su desarrollo, quedando débil y enfermizo, impidiéndole obtener el mismo grado de desarrollo que a no ser por dicha intoxicación hubiera alcanzado. Que parte de dicho ganado eran bueyes que el demandante utilizaba en trabajos de preparación de terreno para siembras de cañas y otras labores, lo que obligó al demandante a suspender la entrega de cañas en la factoría, impidiéndole además sembrar cien cuerdas de cañas de azúcar según había convenido con la Central Cambalache, sufriendo daños en sus negocios agrícolas y resintiéndose seriamente su crédito. Que careciendo el demandante de dinero efectivo y habiéndose resentido su crédito, en la fecha de la radicación de la demanda no había podido conseguir bueyes para realizar sus trabajos, y al no poder sembrar y cultivar terrenos, fué privado de los beneficios razonables de dichas siembras y cultivo. Continúa alegando el demandante por información y creencia que la muerte de su ganado se debió a la negligencia de los demandados consistente: en envasar petróleo (*fuel oil*) en receptáculos defectuosos, sin tomar precauciones para evitar que dicho petróleo (*fuel oil*) se escapara; en situar petróleo en la proximidad del río Santiago, sabiendo o debiendo saber que al escaparse dicho combustible correría por el río y causaría daños a otras personas, no tomando medidas para evitarlo, actuando como si dicha sustancia no fuese nociva.

Los daños que alega haber sufrido el demandante los establece en las siguientes partidas:

| | |
|---|---:|
| Por ganado muerto | $15,750.00 |
| Por retardo en el desarrollo del ganado enfermo que sobrevivió | 478.83 |
| Por alquiler de bueyes para operaciones de zafra | 648.00 |
| Desembolsos para cuidar ganado | 200.00 |
| Otras pérdidas y trastornos en negocios y quebrantamiento de crédito | 8,000.00 |
| Total | $25,076.83 |

Termina la demanda con súplica de una sentencia que condene a los demandados solidariamente a pagarle al demandante el montante de los daños más las costas, gastos y honorarios de abogado, y cualquier otro remedio compatible con las alegaciones.

Contestaron los tres demandados conjuntamente, radicando un escrito de contestación en el que niegan las alegaciones esenciales de la demanda por carecer de suficiente información y creencia. La demandada The Shell Co. (P.R.) Ltd. negó ser una corporación extranjera y alegó en contrario que era una sociedad por acciones organizada bajo las leyes de Inglaterra. Terminó la contestación con súplica de que se desestimase la demanda, con costas, gastos y honorarios de abogado al demandante.

Después de radicada su contestación, los demandados solicitaron y obtuvieron una orden decretando que el demandante les suministrase un pliego de particulares.

Cumplimentando la orden de la corte, el demandante suministró un pliego cuyos particulares esenciales son los siguientes:

1. Se expresa que las fincas a que se refiere la demanda radican, una en los barrios Hato Abajo y Hato Arriba, y las restantes en el mismo barrio Hato Abajo, en Arecibo.

2. Se especifica el sitio en donde estaba el abrevadero del ganado del demandante.

3. Se declara que murieron 86 cabezas de ganado vacuno y 7 de ganado caballar, y se expresa que el ganado que enfermó y no murió consistió en 24 cabezas de ganado vacuno.

4. Se informa que los cuidados especiales que requirió el ganado enfermo consistió en cortar y llevarle yerba y agua, y en la administración de las siguientes medicinas: magnesia calcinada, crema de bismuto, sulfato de soda, huevos con café negro, ron, cebada y semillas de lino, y aceite de oliva.

5. Se expresa que en el cuido del ganado no se empleó veterinario alguno, utilizándose solamente el veterinario para prescribir el tratamiento.

6. Se declara que murieron 35 bueyes de tiro.

7. Se expone que el *fuel oil* es nocivo o peligroso a personas o animales en la siguiente forma: inflamando el tubo digestivo, el estómago e intestinos y causando envenenamiento agudo o crónico.

8. Se dice que la persona a quien el demandante pagó $648.00 por alquiler de bueyes para operaciones de zafra fué don Miguel Correa.

Después de recibir la evidencia sometida por las partes, que consta de 1,100 páginas a maquinilla, la corte inferior dictó sentencia el 5 de mayo de 1937, declarando con lugar la demanda y condenando a los demandados a pagar solidariamente al demandante la cantidad de $3,000 y las costas, sin incluir honorarios de abogado.

Ambas partes establecieron recursos de apelación.

El demandante imputa a la corte sentenciadora tres errores:

"1. La corte erró al resolver que no era justo que el demandante recobrara el costo de alquiler de bueyes para operaciones de zafra.

"2. La corte cometió craso, manifiesto y claro error e incurrió en pasión, prejuicio y parcialidad al apreciar en $3,000 los daños que los demandados vienen obligados a compensar al demandante.

"3. La corte cometió error al resolver que los demandados no fueron temerarios hasta el extremo que justificara su condena al pago de honorarios de abogado."

Los demandados basan su recurso de apelación en siete errores que imputan a la corte sentenciadora, a saber:

"1. La corte inferior cometió error de derecho y fundamental al declarar con lugar la demanda en este caso, basando la misma en un hecho que no está en *issue*.

"2. La corte *a quo* cometió error de hecho y de derecho al resolver que los demandados fueron negligentes, resultando además de tal negligencia daños a la propiedad del demandante.

"3. La corte cometió error al admitir prueba sobre terrenos poseídos por el demandante como condueño o arrendatario en los barrios Hato Abajo y Hato Arriba, y al declarar sin lugar la moción de los demandados solicitando la eliminación de dicha evidencia.

"4. La corte cometió error al declarar sin lugar las mociones de *nonsuit* de los demandados.

"5. Que la evidencia aducida por el demandante en cuanto al hecho último esencial para establecer la causa eficiente que produjo los daños alegados en la demanda no pasa de ser una conjetura o posibilidad que no posee el carácter de una probabilidad demostrada. Y que la corte inferior cometió error de derecho y de hecho al declarar con lugar la demanda porque la sentencia así dictada descansa, en cuanto a dicho hecho último esencial (*ultimate fact*) en una mera conjetura o posibilidad.

"6. La sentencia dictada por la corte inferior es contraria a la ley y no está sostenida por la evidencia en cuanto al demandado Manuel Sierra.

"7. La corte inferior cometió error al declarar con lugar la demanda en este caso y al fijar en $3,000 los daños que los deman-dados deben satisfacer al demandante.".

El demandante adoptó el procedimiento de exposición del caso para elevar la evidencia a este tribunal. Los demandados lo hicieron mediante una transcripción de evidencia.

Los demandados establecieron apelación contra la resolu-ción de la corte sentenciadora que aprobó la exposición del caso sometida por el demandante, pero el día señalado para la vista se estipuló por ambas partes con la aprobación de este tribunal que en la tramitación de ambos recursos se uti-lizaría exclusivamente la transcripción de evidencia elevada por los demandados, resultando así académica la apelación interpuesta contra la orden aprobatoria del pliego de excep-ciones y exposición del caso preparados por el demandante.

Procede, por consiguiente, desestimar dicho recurso por académico.

De existir los errores señalados por los demandados, pro-cedería desestimar la demanda y en ese caso sería innecesa-rio considerar los señalados por el demandante, ya que su recurso de apelación va dirigido exclusivamente a aumentar la cuantía de la sentencia y a que se haga un pronuncia-miento a su favor por honorarios de abogado.

Antes, sin embargo, es preciso hacer un análisis de la evidencia para poder determinar si los demandados son le-

galmente responsables de los daños que alega haber sufrido el demandante.

Según la evidencia del demandante, a fines de febrero o principios de marzo, y antes de dichas fechas, poseía él en Arecibo varias fincas, unas a título de dueño y otras en concepto de arrendatario, algunas de las cuales dedicaba a la siembra y cultivo de la caña de azúcar, que molía en la Central Cambalache. En una de dichas fincas, colindante con el río Santiago, dedicada a pastos, apacentaba los bueyes de que se servía en sus faenas agrícolas, otras cabezas de ganado vacuno, algunas yeguas de carreras con sus crías y un semental de carreras llamado Marqués de la Plata. Todo este ganado estaba suelto y como la parte de la finca que colinda con el río no estaba cercada, cuando tenía sed bajaba al río a beber. Una mañana a fines de febrero o principios de marzo de 1930, el demandante fué informado por su mayordomo que no había podido enyugar los bueyes para las labores del día porque se hallaban enfermos, acostados en el pasto y no se levantaban. Inmediatamente el demandante salió de su casa para el sitio donde se hallaba el ganado, lo examinó, y pudo observar que el ganado tenía el hocico, las patas y parte del cuerpo impregnados de una sustancia negra y además tenía diarrea. (T. de E., 47.) Fué entonces al río y vió en él una sustancia negra que palpó y le olió a petróleo. Las aguas estaban descompuestas y malolientes, debido a los peces, cangrejos, anguilas y camarones muertos que contenían. Ordenó entonces el traslado del ganado a otra de sus fincas cercana a su casa de vivienda y dispuso que lo pusieran a la sombra, dirigiéndose entonces en automóvil a la Central Los Caños. En la Central vió un tanque grande de petróleo situado como a tres o cuatro metros de un caño que desagua en el río Santiago. El terreno junto al tanque estaba completamente impregnado de petróleo, que corría al caño y de éste pasaba al río. En la Central procuró al Sr. Fraticelli, su administrador, pero le informaron que se hallaba de vacaciones y que el Sr. Loveday lo sustituía. Éste

discutía acaloradamente con el Sr. Gómez, agente de la Shell Co. en Arecibo, sobre el petróleo derramado. Le comunicó al jefe de la Central y al Sr. Gómez el daño que le habían hecho en el ganado con el petróleo, saliendo Gómez con el demandante a observar los daños que éste alegaba haber sufrido. Entraron a la finca, pero al empezar a ver el ganado enfermo y un buey muerto, dijo Gómez que estaba cansado, que no estaba acostumbrado a caminar y regresó a Arecibo. Trató el demandante de ver al Juez Municipal y no lográndolo, trajo entonces al Secretario de dicha corte para que observara el ganado, acompañándolo después a la Central a ver el tanque de petróleo. Se comunicó entonces por telegrafo con el Departamento de Agricultura y envió también un telegrama al veterinario del Departamento, Dr. Menéndez Guillot, quien por orden del Dr. Bagué, Subcomisionado de Agricultura, llegó el 6 de marzo de 1930 a la finca del demandante. Declaró el Dr. Menéndez que en un ranchón cerca de la casa vió seis bueyes y dos caballos. Al examinarlos advirtió que uno de los animales estaba muerto y los otros, aunque estaban en pie, se tambaleaban como si tuviesen dolores cólicos, pues escarbaban con las patas delanteras, se echaban, se levantaban y tenían una diarrea profusa aunque no sanguinolenta. Alrededor de la boca, en las patas y en el cuerpo de los animales notó manchas de un aceite negro, lo que le hizo creer que la causa de la enfermedad era el haber ingerido aquella sustancia. A pesar de que no había por allí un tanque de inmersión y de que los síntomas que presentaban no eran los de envenenamiento con arsénico, preguntó si los animales habían sido bañados con solución arsenical y se le informó que no. Eliminó el diagnóstico de antrax, porque los síntomas que presentaba el ganado no eran los de esa enfermedad. Prescribió, y luego de explicar la forma de aplicar el tratamiento, regresó a San Juan.

El demandante y aquellos testigos suyos que vieron el ganado y observaron el río a raíz de los sucesos, aseguran que las aguas estaban cubiertas de unas manchas negras

como de aceite, principalmente en sus márgenes, y que las plantas y yerbas que crecen en las orillas estaban embadurnadas con idéntica sustancia. Que se veían peces pequeños, anguilas, cangrejos, etc., muertos, flotando sobre las aguas o en las orillas del río, cuyas aguas despedían un mal olor producido, según ellos, por los peces en estado de descomposición. Aun el testigo Gómez Badillo, agente en Arecibo de la demandada The Shell Co. (P. R.) Ltd., testigo de los demandados, admitió en el examen de repreguntas que vió manchas de petróleo en el río, asegurando, sin embargo, que eran pequeñas. (T. de E. 780.) Los demás testigos del demandante que vieron el ganado, tales como Ernesto Acevedo, Inspector de Sanidad de Arecibo, Gumersindo Román, secretario de la corte municipal de dicha ciudad, y José Colón, aseguraron que el ganado mostraba las manchas de petróleo que describió el Dr. Menéndez en su declaración.

Otro testigo del demandante, José Colón, quien de la prueba no resulta ser pariente de aquél aunque lleva el mismo apellido, declaró que en la misma fecha en que ocurrieron los hechos a que se refiere la demanda, tenía él cierto ganado en una finca por donde pasa el río Santiago, más abajo de la Central Los Caños y de los terrenos del demandante. Que observó las manchas de aceite en el río y que su ganado bebió en él y se le enfermó, presentando los mismos síntomas que el ganado del demandante. Que les dió un purgante, pero siempre perdió cuatro cabezas de ganado que no le fueron pagadas por la Central Los Caños, de la cual es un pequeño colono con 15 cuerdas de cañas. (T. de E. 454.)

Otros detalles de la prueba del demandante serán expuestos al discutir las distintas partidas de los daños reclamados.

La declaración del Dr. del Valle Sárraga, perito del demandante, comprende de la página 472 a la 643 de la transcripción de evidencia. Resumiendo su extensa declaración, podríamos exponerla así:

El 16 de abril de 1930 el demandante y su abogado Sr. Arrache, lo visitaron en su oficina trayendo ciertas muestras

de *fuel oil* pará investigación, muestras que rechazó el perito porque habían sido tomadas por los propios interesados y no reunían las condiciones de autenticidad necesarias para basar en ellas un informe. Les instruyó entonces que utilizaran los servicios de un notario para que diera fe de las condiciones y circunstancias en que tomaban las muestras, y les suministró los envases que debían utilizar para ello. El día 22 de abril de 1930 recibió por *express* una caja que contenía un envase como de dos litros con agua contaminada y una lata con tres libras de tierra aproximadamente y unas hojas. El envase conteniendo agua estaba tapado con corcho, lacrado y sellado con el sello del notario Ulpiano Crespo. La lata que contenía la·tierra estaba amarrada con.cordón y lacrada y sellada con el mismo sello notarial. La caja donde venían los dos envases era de las llamadas *shipping boxes*, de madera, rotulada con el nombre del testigo, clavada, se hallaba en buen estado y no presentaba señales de haber sido abierta. Antes de seguir adelante, haremos una digresión para expresar dónde, cuándo y cómo fueron tomadas esas muestras, según resulta del acta notarial levantada, ofrecida y admitida en evidencia con la oposición de los demandados. Sobre la admisibilidad de este documento nos ocuparemos más adelante en el curso de esta opinión. Después de exponer el requerimiento que le hiciera el demandante para que diera fe de la toma de las muestras, el notario autorizante expuso la siguiente "Diligencia":

"En el mismo día (o sea el 21 de abril), siendo las diez y seis horas, o sea las cuatro de la tarde, yo, el Notario, me personé en la finca de los hermanos Colón, sitio El Tanque, barrio Hato Abajo, de Arecibo, aproximándose (*sic*) a la margen del río Santiago que atraviesa esa finca, tomé una botella limpia y un tapón de corcho nuevo y la llené aproximadamente con dos litros de agua turbia del río, impregnada con gran cantidad de una sustancia negra, gruesa y maloliente que flota en la superficie del agua y se encuentra también adherida a las márgenes de·cierta parte del río, cuya muestra de agua rotulo, tapo, lacro y sello y la deposito en la oficina de la

American Express dirigida al Dr. R. del Valle Sárraga, químico, residente en San Juan.

"También me trasladé a un sitio próximo a la margen del río y en terrenos propiedad de la Central Los Caños, y tomé en un recipiente de lata aproximadamente tres libras de tierra negra, pedregosa, tomada en el mismo sitio donde se me señala que fué derramado el contenido del tanque de petróleo crudo, cuyo recipiente de lata también sello y lacro en el día de hoy."

Continuó informando el perito Del Valle Sárraga que al recibir la caja del *express* sacó los dos envases que estaban lacrados y sellados, los examinó cuidadosamente para determinar cuál de los dos le ofrecía el aceite con la menor cantidad de contaminación con materias extrañas, advirtiendo que estas cualidades las ofrecía mejor la lata donde venía la tierra, porque el agua estaba muy sucia y traía sedimentos que indicaban que el sitio donde tomaron la muestra estaba "revuelto". Observó que las hojas que venían con la tierra estaban en la parte superior de la lata y que una de ellas estaba bastante embadurnada con aceite *fuel*. Tomó entonces una espátula de acero de las que se utilizan comúnmente en los laboratorios y trató de separar la mayor cantidad posible del aceite que estaba adherido tenazmente a la hoja. La lavó con éter *petrólico* y al evaporar éste quedó entonces un residuo de aceite *fuel*. Hizo un análisis cualitativo del aceite para cerciorarse de que era *fuel oil* y convencido que lo era, tomó aproximadamente una gota, cogió un conejillo de Indias y sobre la superficie de la lengua dejó caer la gota de *fuel oil*. El animal empezó en seguida a paladear e inmediatamente se embadurnó toda la boca con aquello. Lo dejó entonces en su canastillo de observación, le puso agua y yerba verde y en otro canastillo puso otro conejillo de Indias al que le dió lo siguiente: la misma yerba verde que le dió al primero como alimento, la misma clase de agua, del acueducto, y una cantidad del residuo del aceite "petrólico" solo, sin aceite *fuel*, de manera que este conejillo testigo recibiera de primera intención todos los elementos que le dió a ingerir

al otro, menos el aceite *fuel*. De momento no notó absolutamente nada, excepto que el conejillo que tomó el aceite *fuel* se quedó un largo rato sin tocar el alimento, mientras que el otro comía, y de vez en cuando el primero movía la boca como para quitarse algo extraño que le molestaba. No notó que tomara alimento durante la hora siguiente, mientras que el conejillo testigo seguía tomando su yerba. De cuando en cuando el testigo se la refrescaba a uno y a otro con un poco de agua. No notó nada extraño como por espacio de tres o cuatro horas, después de lo cual observó que el conejillo que había ingerido el aceite *fuel* en la forma descrita se puso algo triste, no obedecía a los reflejos naturales del observador del laboratorio cuando quiere cerciorarse que el animal se siente enfermo, que es hacerle ruido cerca de un oído con los dedos de la mano, o darle una palmada o tocarlo con la yema del dedo sobre el espinazo. Cuando le hacía esto al animal en observación, no se movía, parecía que estaba en una situación de retraimiento, sin demostrar alguna otra cosa, mientras que el otro estaba nervioso, como ellos acostumbran estar siempre y obedecía muy bien a todos estos ruidos a que se apela para saber si están en estado normal. Algo así como a las seis u ocho horas el animalillo que había tomado .el aceite *fuel* empezó a mostrar cierto encrespamiento del pelo indicativo de que se sentía enfermo. No observó ninguna otra cosa ni aún durante la noche, excepto que el animal estaba triste y no obedecía a los reflejos. Al día siguiente por la mañana, cuando lo cogió y lo examinó, notó que había tenido diarrea una diarrea que no era todavía muy fuerte, se le notaba alrededor del ano cierta humedad que creyó el testigo al principio que era orina pero al poco rato de estarlo observando notó que tenía un poco de tenesmo, y una de las veces que hizo contracción echó un poco de excreta líquida. Varias horas después, pero dentro de las veinticuatro horas, el cuadro empezó a desarrollarse dentro de un cuadro de fenómenos gastrointestinales. No había vómitos porque el conejillo de Indias no vomita aun estando gravemente intoxicado

a menos que haya ingerido algo muy cáustico. La diarrea se fué haciendo cada vez más profusa y más frecuente, hasta que últimamente se le notó un timpanismo bastante pronunciado. El vientre estaba tan tenso como si fuera la película de un tambor. Después de eso ya el animal se echó a un lado y no se levantaba aunque lo pincharan con algún objeto punzante, continuando así hasta que murió.

Inmediatamente que murió y antes de que se iniciara la putrefacción cadavérica, el testigo le practicó su autopsia, que consistió en la apertura del viente, primero, cortando la piel hasta exponer completamente el peritoneo. La cara externa del peritoneo no ofrecía nada de particular. Lo abrió. Al abrirlo, encontró entonces que todas las vísceras estaban normales, que no había absolutamente cambio patológico alguno ni en el corazón ni en los pulmones ni en el hígado, pero el intestino se notaba enfermo, aumentado de volumen, y con una distensión muy grande. Dentro del peritoneo había una cantidad de líquido abundante. Se comprendía, agrega el testigo, que el efecto de este *fuel oil* determinó un timpanismo bastante pronunciado debido al derrame seroso que había dentro de la cabida peritoneal. Abrió el intestino y pudo darse cuenta que los alimentos que antes del experimento había ingerido el conejillo, debido al aumento de secreción de los jugos del intestino por la irritación, o lo que fuera, estaban completamente licuados. No había derrames, no había petequias, ni ningún fenómeno indicativo de haber ocurrido hemorragias. Mientras tanto el conejillo testigo estaba completamente bien y no acusaba absolutamente fenómeno alguno de intoxicación ni con el alimento ni con el agua ni con el residuo de aceite "petrólico" que le fué administrado. Para convencerse, continúa el perito, de que estaba en presencia de algo tóxico o no tóxico, toda vez que hay sustancias que sin ser tóxicas pueden causar la muerte, tomó la muestra de agua y la centrifugó en una máquina de centrifugar de laboratorio para separar el aceite. Así que

la centrifugación separó un poco el aceite, valiéndose del aceite "petrólico" que después evaporó, logró obtener el aceite bastante puro dentro de su naturaleza.

Informó entonces al demandante Sr. Colón sus conclusiones con respecto a la causa de la muerte del ganado en la siguiente forma: la muerte podía obedecer:

1. A la ingestión del aceite *fuel* que se hallaba sobre la superficie del río, siendo dicho aceite una materia química de viscosidad extrema, de tal modo que se adhiere con tenacidad a toda la superficie del tubo digestivo, forma una capa sobre los tejidos delicados de la mucosa, naturalmente paralizando sus funciones fisiológicas normales, y este cuerpo extraño, tenazmente adherido en la forma expresada, sin que haya poder alguno de defensa de la naturaleza del animal para removerlo, determina, con las horas y con los días— dependiendo de la cantidad ingerida—en primer término, irritación, después congestión, precisamente por la tenacidad con que se adhiere y por el hecho de que no se remueve bajo circunstancia alguna; después viene la inflamación natural y lógica en estos procesos y finalmente por las infecciones secundarias que se causan se produce la muerte.

2. A que, existiendo una capa de aceite sobre la superficie del agua, se cortó completamente el contacto y la comunicación física entre los gases del aire y el agua, retardando la absorción del oxígeno y nitrógeno al agua, lo cual tiene lugar a virtud de la presión atmosférica, y cuando la extensión de aceite es muy grande, suprime esta absorción en absoluto, ocurriendo entonces lo siguiente: que la pequeña cantidad de oxígeno que hay disuelta en el agua se consume en la oxidación de las materias orgánicas que como detritus van asociándose al agua constantemente, se consume esa pequeñísima cantidad de oxígeno por la respiración de los peces, y entonces viene la muerte de éstos por asfixia. Ocurrido esto, a las pocas horas tiene lugar la putrefacción de la potreína de los peces muertos, que es la peor de todas las putrefacciones, porque es la que en sumo grado desarrolla enormes cantidades de toxinas y la presencia de estas toxinas trae entonces la muerte de otros peces, trayendo esto como consecuencia, finalmente, la contaminación del agua, a tal extremo que el ganado vacuno o caballar que vaya a beber de esa agua se enferma y muere por su contaminación.

3. La posibilidad de muerte al ingerirse aceite *fuel* debido a la acción tóxica. directa; y

4. La teoría de que los tres factores conjuntamente hayan determinado la muerte de los animales que abrevaron donde existía el agua contaminada con *fuel oil*. (T. de E. 519–523.)

Pasemos ahora a la prueba de los demandados. La demandada The Shell Co. (P. R.) Ltd. vendía *fuel oil* a su codemandada Plazuela Sugar Co., que lo utilizaba como combustible en su factoría de la Central Los Caños. Este combustible lo enviaba la vendedora en vagones tanques de su propiedad, por ferrocarril, entregándolo en la misma factoría. De los records de la American Railroad Co., traídos por el testigo de los demandados Angel Rivera, jefe de oficinas de dicha American Railroad Co., aparece que un embarque de *fuel oil* fué recibido por la Central Los Caños el 27 de febrero y otro el 7 de marzo de 1930. El 28 de febrero empezó Manuel Sierra Sánchez a echar por medio de una bomba el *fuel oil* de los vagones tanques de la vendedora al tanque que para ese objeto tenía la Central Los Caños en su factoría. Al tratar de conectar el vagón con la tubería del tanque de la central, empezó a derramarse el aceite, saliendo en un chorro de seis pulgadas de diámetro que caía en el suelo y de allí por una zanja iba a parar al caño que desagua en el río Santiago.

El testigo de los demandados, Manuel Sierra Sánchez, mecánico de la Central Los Caños, encargado de vaciar los vagones tanques en el recipiente de la Central Los Caños, nos describe en la siguiente forma cómo se derramó el *fuel oil*:

"Cuando yo fuí a vaciar este tanque aquí, en la parte abajo, un niple que traía, un pedazo de tubo largo, desenrosqué un tapón que hay que desenroscar aquí para conectar la tubería que tienen los tanques de la Central, y cuando lo desenrosqué aquí, esta válvula que está interiormente estaba abierta y al yo desenroscar, el petróleo rodó." (T. de E. 713).

El mismo testigo, explicando por qué no se derrama el *fuel oil* al pasarlo al recipiente de la central, declara:

"No se derrama porque aquí tienen una válvula por dentro, dentro del tanque tienen una válvula que está cerrada, completamente cerrada, y entonces una vez está unida la tubería de la Central con la del tanque, se abre esta válvula y da cabida para bombear." (El testigo declara refiriéndose a un dibujo de los vagones tanques en la pizarra de la corte.)   (T. de E. 715.)

Más adelante, al preguntársele qué hizo el testigo cuando vió que se derramaba el tanque, contestó:

"Cuando yo . . . para yo hacer esto, tengo casi que meterme debajo del tanque, y al yo desenroscar el tapón, que rodó el petróleo, me paré prontamente y entonces llamé al Sr. Manuel Sierra (Sierra Rodríguez) que venía a ver lo que yo estaba haciendo, y le dije: 'Se pierde el petróleo,' y entonces él, que lo estaba viendo que ya rodaba, volvió a la parte encima del tanque y trató de cerrarlo con la mano y no pudo, pero ya yo tenía un tubo en la mano que lo usamos para eso y se lo dí y con ese tubo que usamos en el transbordo del petróleo, él cerró la válvula." (T. de E. 716.)

El jefe de los mecánicos de la Central Los Caños, Manuel Sierra Rodríguez, explicando la causa de haberse derramado el petróleo y refiriéndose a un dibujo en la pizarra de la corte, declaró:

"Este niple trae un tapón enroscado aquí, y entonces para vaciarse el tanque, se desenrosca el tapón. Éste tiene una válvula interior *que estaba abierta,* y al quitársele el tapón trata de escaparse el petróleo." (T. de E. 732.)   (Bastardillas nuestras.)

Nos describe lo que hizo para impedir que continuara perdiéndose el petróleo, en la forma siguiente:

"Me subí arriba al tanque y traté de cerrar la válvula pero no pude y entonces le pedí a él (Sierra Sánchez) un pedazo de tubo que usamos allí para palanquear el tubo general y entonces lo empleé por los rayos de la rueda y cayó la válvula." (T. de E. 729.)

Según el ingeniero James Livingston, empleado y testigo de la demandada The Shell Co., se le reportó lo ocurrido con el vagón tanque el 28 de febrero y vino a examinarlo el 3 de marzo de 1930. Declaró este testigo que el mecanismo del vagón tanque estaba en perfectas condiciones, y que el ha-

berse derramado el aceite no fué por defecto alguno del vagón.

No debemos perder de vista, sin embargo, que según los mecánicos Sierra Rodríguez y Sierra Sánchez, que detuvieron el derrame del petróleo, el defecto del vagón consistió en que tenía una válvula abierta que debió haber venido cerrada, y que al desenroscar el tapón que da salida al petróleo para conectarlo con la tubería de la central, hallándose abierta la válvula, se derramó el petróleo, quedando todo corregido tan pronto Manuel Sierra Rodríguez logró cerrarla. Por consiguiente, corregido el defecto el 28 de febrero, fácilmente se explica que al examinar el vagón el ingeniero Livingston el 3 de marzo lo encontrara en perfectas condiciones.

Tanto el testigo Gómez Badillo, *manager* de The Shell Co. en Arecibo, como el ingeniero Livingston, admiten que el lunes 3 de marzo de 1930, al ir ellos a investigar lo sucedido con el vagón tanque, vieron allí a Amado Colón que se quejaba de los daños que había sufrido su ganado con motivo de la sustancia derramada en el río.

De acuerdo con la prueba de los demandados, la cantidad de *fuel oil* derramada no bajaba de 1,000 galones. Aseguró el Sr. Bird, *assistant manager* de The Shell Co. (P. R.) Ltd., que los vagones tanques tenían una capacidad de 5,020 galones, y como el ingeniero Livingston declaró que una tercera parte del vagón tanque se había derramado, tenemos entonces que la cantidad derramada, en términos de galones, debió ser una tercera parte de 5,020, o sea 1,673 galones de *fuel oil.*

Luis García de Jesús, testigo de los demandados, era mayordomo de ganado de la Central Los Caños. Cuidaba ganado en una finca de su principal, aguas abajo de la central. Declaró que vió en el río Santiago en aquella ocasión manchas de aceite, que el ganado bajo su cuidado bebió de sus aguas y que nada le ocurrió. Admitió, sin embargo, en el examen de repreguntas, que el ganado no bebió donde había

manchas de aceite, no pudiendo asegurar que hubiera ingerido dicha sustancia. (T. de E., 828.)

Debemos consignar ahora que el río Santiago tiene una corriente muy lenta, es muy estrecho, y según el demandante, en algunos sitios mide de un metro y medio a dos metros de ancho y un metro o un metro y medio de profundidad. (T. de E. 45.) Según el testigo de los demandados Luis García de Jesús, el ancho mínimo del río en tiempo de seca es de cinco a seis pies y el sitio más llano mide de tres a cuatro pies de profundidad. (T. de E. 827.) En la inspección ocular que practicó la corte en Arecibo en 18 de enero de 1936 (T. de E. 1099–1101), se expresa que el río Santiago es una corriente de agua de escaso caudal aunque de alguna profundidad y que en la confluencia del caño y el río Santiago, el río escasamente mide dos metros de ancho, es llano, sin corriente apenas, siendo su mayor fuente el caño a que hemos hecho referencia.

Hasta aquí la prueba tiende a demostrar concluyentemente que cierto aceite combustible (*fuel oil*) vendido por The Shell Co. (P. R.) Ltd. a la Plazuela Sugar Co. y entregado a esta última en la Central Los Caños en Arecibo, se derramó de uno de los tanques en cantidad que fluctúa entre mil y 1,600 galones aproximadamente; que este aceite combustible fué a parar a las aguas del río Santiago, produciendo manchas de aceite sobre la superficie del río; que cierto ganado del demandante abrevaba para aquella fecha en el río Santiago, y que coincidiendo con el escape del aceite combustible un considerable número de dicho ganado apareció enfermo, mostrando marcas de aceite combustible en el hocico, en las patas y en otras partes del cuerpo, y que una parte de ese ganado enfermo murió.

La prueba pericial del demandante tiende a demostrar que la enfermedad y muerte de su ganado fué causada por haber tomado agua en el río mientras existía en el mismo aceite combustible.

Los demandados, con prueba pericial y experimental, trataron de demostrar que el aceite combustible (*fuel oil*) es una materia inofensiva a la salud de los animales. A este efecto declaró el Dr. Jaime Bagué, veterinario de profesión, sobre el hábito del ganado vacuno y caballar de no beber agua en que pueda existir mal olor o que contenga cualquier materia extraña, de la naturaleza del *fuel oil,* llegando a la conclusión de que el ganado del demandante no bebió el agua del río Santiago cuando contenía el aceite en cuestión. Para demostrar que el *fuel oil* no es nocivo, se refirió al experimento que por cuenta de los demandados hizo él en un buey, con la cooperación del químico Sr. Pesquera y en presencia de los abogados de los demandados.

El otro perito de los demandados, Sr. Angel M. Pesquera, químico de profesión, explicó más detalladamente el experimento a que se refirió el Dr. Bagué y asimismo hizo en presencia de la corte una prueba con conejillos de Indias y peces para demostrar que el *fuel oil* es completamente inofensivo y que no pudo ser la causa de la enfermedad y muerte del ganado del demandante.

No vamos a exponer en detalle uno y otro experimentos. Bastará decir que el que se hizo en presencia de la corte, con toda clase de garantías para la parte demandante, demostró concluyentemente que el *fuel oil* que ingirieron los conejillos de Indias y el que se echó en las peceras no hizo daño alguno a los animales, probando así que la sustancia que se usó para el experimento, o sea, el *fuel oil* que en la fecha del juicio, noviembre de 1935, vendía The Shell Co. (P. R.) Ltd., era completamente inofensiva.

El mismo resultado tuvo el experimento que hicieron el Dr. Bagué y el Sr. Pesquera en los bueyes. Según el Dr. Bagué, a un solo buey le hizo ingerir un galón del mismo *fuel oil* usado en el experimento ante la corte y ningún efecto produjo en la salud del animal.

Además, en presencia de la corte y de las partes representadas por sus respectivos abogados, el 23 de diciembre de

1935, se repitió la prueba con tres bueyes en una finca del barrio de Sabana Seca, de Toa Baja, dándose a cada uno de ellos, a las 11:30 de dicho día, 32 onzas del mismo *fuel oil* que se había usado en la corte. A la 1:30 del mismo día la corte los examinó de nuevo y expresó que nada extraño observaba en ellos y que estaban comiendo. A las 10 a. m. del día siguiente, volvió la corte a Sabana Seca y observó que la apariencia externa de los tres bueyes era normal, estaban comiendo y sus heces fecales eran normales. Trajeron entonces los animales juntos a dos tanques de agua en uno de los cuales se vertió previamente una cantidad de *fuel oil*. Los animales estaban sin beber desde el día anterior por la tarde, según consignó la corte. Uno de ellos se acercó al tanque donde se había vertido el aceite combustible y no lo tomó, con lo que se dió por terminado el experimento. (T. de E. 1095–1098.)

El 30 de abril de 1936 se constituyó de nuevo la corte en Sabana Seca y después de identificar los bueyes que habían sido objeto del experimento, uno color indio, marcado con el número 501, otro hosco amarillo, número 73, y otro hosco negro, número 89, observó la corte que estaban, por su apariencia, en perfecto estado de salud, sin haber sufrido perturbación alguna en su economía. (T. de E. 1101.)

Si ninguna otra evidencia se hubiera aducido después de los experimentos practicados por los peritos de los demandados, a pesar de todas las circunstancias concurrentes, forzosamente tendríamos que concluir que el aceite combustible (*fuel oil*) no pudo ser la causa directa ni indirecta de la enfermedad y muerte del ganado; pero el demandante trajo de nuevo al perito Sr. del Valle Sárraga en prueba de refutación (*rebuttal*) y su declaración tiende a destruir el efecto probatorio de los experimentos practicados por los demandados. Declaró el Sr. del Valle que el aceite combustible que vendía The Shell Co. (P. R.) Ltd. en el año 1930 no era el mismo producto que con igual nombre vendía en la fecha en

que se celebró el juicio en este caso (1935) y se llevaron a efecto los experimentos en cuestión. Sostenido por la obra *"A Petroleum Handbook compiled by members of the Royal Dutch Shell Group"*, pág. 100, escrito por un grupo de ingenieros y químicos especializados en petróleo, y usado según el testigo, sin contradicción por la parte contraria, en las estaciones de The Shell Co., aseguró que el *fuel oil* que en 1935 vendía The Shell Co. no era tóxico, porque la gasolina era entonces sometida a cierto proceso que la obra denomina *cracking process* por medio del cual se consigue eliminar las materias tóxicas que contenía el *fuel oil* que se expendía allá por el año 1930.

Alegan los demandados, sin embargo, que la declaración en *rebuttal* del testigo del Valle no era admisible porque estaba basada en una obra y no en conocimiento propio del testigo, y que esa obra no hubiera sido admisible en evidencia por no ser de autores responsables, toda vez que sus nombres no aparecían en el libro.

A nuestro juicio no cometió error alguno la corte sentenciadora al admitir la declaración del Sr. del Valle. Este testigo declaraba como perito y no es imprescindible que un perito declare siempre basado en su propia experiencia. Él puede basarse en la experiencia de otros y en obras sobre la materia que haya leído o estudiado. 2 *Jones on Evidence* (ed. 1938), pág. 687 *et seq.* Sobre el valor probatorio de las obras científicas, dice Wigmore:

"Debemos admitir que aquéllos que escriben sin tener en mente un litigio son por lo menos tan dignos de crédito, aunque no sean examinados bajo juramento, como la mayor parte de aquéllos que se sientan en la silla testifical cobrando honorarios de uno de los litigantes." 3 *Wigmore on Evidence*, 2da. ed., 640.

Véase también lo que el mismo autor dice acerca de la admisibilidad en evidencia de listas comerciales y profesionales, registros e informes. Obra citada, tomo 3, pág. 652.

Habiendo expuesto toda la prueba que tuvo ante sí la corte sentenciadora, con excepción a la relativa al montante de daños, que consideraremos en su oportunidad, discutiremos en primer término los errores señalados por los demandados apelantes, aunque separándonos del orden en que han sido planteados.

█ El cuarto señalamiento de error dice así:

"La corte cometió error al declarar sin lugar las mociones de *nonsuit* de los demandados."

Al terminar la prueba del demandante el demandado Manuel Sierra Rodríguez presentó una moción de *nonsuit* que fué desestimada. Igual suerte corrió la que inmediatamente después presentó la demandada Plazuela Sugar Co. (T. de E., 644-647.)

No podemos comprender qué base pudo tener la corte inferior para dictar sentencia contra el demandado Manuel Sierra Rodríguez. De la prueba del propio demandante no surge ni siquiera remotamente acto alguno de negligencia por parte de Manuel Sierra Rodríguez. Ya hemos visto que este demandado era un simple empleado de la Central Los Caños, que actuaba como jefe de los mecánicos y que su actuación en este caso se limitó a corregir el defecto del vagón tanque de la demandada The Shell Co. (P. R.) Ltd. al ser llamado por el otro mecánico Manuel Sierra Sánchez. Él no venía obligado a recoger el aceite derramado porque ese trabajo no estaba dentro de sus atribuciones, según resulta de la prueba del propio demandante. Por consiguiente, cometió error la corte sentenciadora al desestimar la moción de *nonsuit* presentada por este demandado.

█ No podemos convenir, sin embargo, con los demandados apelantes en que igualmente constituyó error desestimar la moción de *nonsuit* de Plazuela Sugar Co., como veremos al considerar sus señalamientos de error 1, 2, 5, y 6 que estudiamos a continuación.

Como el recurso de apelación se interpone contra la sentencia y no contra los razonamientos o fundamentos que le sirven de base (*González* v. *Vilella*, 24 D.P.R. 281; *Filardi* v. *Barreda*, 24 D.P.R. 391; *Berio* v. *American R. R. Co.*, 24 D.P.R. 409; *Alcaide* v. *Morales*, 26 D.P.R. 238, 240; *Avilés* v. *Hijos de Rafael Toro, S. en C.*, 27 D.P.R. 671), veamos si en efecto la evidencia aducida justifica una sentencia a favor del demandante.

Que el demandante sufrió daños con motivo del aceite combustible arrastrado por el río, es un hecho que no admite discusión. La cuestión a resolver es, quién está en el deber de resarcirlos. Prescribe el artículo 1802 del Código Civil que "el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado." Pero es fundamental en materia de negligencia que ésta sólo da lugar a una causa de acción cuando ha sido la causa próxima del daño. Amparándose en este principio legal arguyen las demandadas que en el supuesto de haber sido ellas culpables de negligencia, ésta no fué la causa próxima de los perjuicios que alega haber sufrido el demandante, toda vez que la causa eficiente del daño fué la intervención de un agente independiente, que de no haber intervenido, ningún perjuicio se hubiera causado.

Es incuestionable que la demandada The Shell Co. (P. R.) Ltd. fué culpable de negligencia al no cerrar la válvula del vagón tanque, pues debió prever que al desenroscar el tapón del vagón para conectarle la tubería que habría de derramar el aceite en el tanque o depósito de la Central, no estando cerrada la válvula, necesariamente se escaparía el combustible. Pero, ¿fué esta negligencia la causa próxima del accidente? ¿Podía esta demandada prever que su negligencia sería capaz de producir un daño de la naturaleza del causado al demandante? Todo lo que podía prever era que al desenroscar el tapón se derramaría el aceite, pero no que había de permitírsele descender hasta un río de cuyas aguas

habría de beber el ganado de otra persona. A este efecto dice *Bohlen & Harpen on "Torts"*, pág. 258, sec. 211:

"El criterio principal y más conocido para determinar la causa próxima es el de la posibilidad de prever el daño (*the test of foreseeability*). Si el daño específico (*the particular harm*) sufrido pudo razonablemente preverse al tiempo de realizarse el acto negligente del demandado, tal acto u omisión es la causa legal del daño. Esta regla ha sido enunciada en muchos casos (se citan). La previsión (*foreseeability*), se recordará, es la base fundamental de la ley de negligencia. Para que exista negligencia el demandado debe haber actuado o dejado de actuar de tal modo que una persona razonable hubiera podido darse cuenta de que ciertos intereses de determinadas personas estaban irrazonablemente expustos a una clase general pero definida de riesgos. Ahora bien, si el daño realmente ocurrido es uno de los riesgos que hacían que la conducta del demandado fuese negligente, es obvio que el daño causado es una consecuencia de la cual el demandado debe ser legalmente responsable. De no ser así no existe responsabilidad legal. En términos generales, podría decirse que todas las consecuencias que ocurren en forma tal que el demandado pudo preverlas al tiempo de su acto u omisión, son legalmente causadas por el incumplimiento de un deber."

A manera de ilustración nos vamos a referir al caso de *John Wanamaker (N. Y.) Inc.,* v. *Otis Elevator Co.* (N. Y., 1920), 126 N. E. 721. Otis Elevator Co. construyó, vendió e instaló un elevador en la tienda que la compañía Wanamaker posee en Nueva York. Una parroquiana del establecimiento, mientras usaba el elevador, sufrió daños personales al romperse ciertos cables que lo sujetaban. Por vía de *dictum* dijo la corte que la parroquiana pudo haber reclamado indemnización no sólo de la compañía Wanamaker, si que también de Otis Elevator Co. conjuntamente, o de cualquiera de las dos por separado. En aquel caso la clase de daño sufrido por la parroquiana pudo haber sido previsto por Otis Elevator Co., pues tenía que saber que de romperse los cables que servían de soporte al elevador, con toda probabilidad habrían de sufrir daños las personas que lo ocupasen en el momento del accidente. En otras palabras, los daños causados podían ser

razonablemente previstos y eran a la vez una consecuencia lógica y natural del acto negligente. Véase también *Mac-Pherson* v. *Buick Motor Co.*, 217 N. Y. 382.

A nuestro juicio, el acto de la demandada The Shell Co. (P. R.) Ltd. en el presente caso, sólo proporcionó una condición dentro de la cual se desarrolló el acto negligente de la otra demandada, que, como veremos más tarde, fué la causa próxima del daño sufrido por el demandante.

Al escaparse del vagón tanque el aceite combustible y derramarse en el suelo, la demandada Plazuela Sugar Co. razonablemente debió prever que de no evitarlo, iría a parar al caño y de allí al río Santiago, que las aguas de ese río eran o podían ser usadas por los propietarios ribereños y otras personas para distintos usos, entre ellos para abrevar ganado, y que contaminadas con el aceite podían causar el daño que en efecto causaron. En tales circunstancias era el deber legal de esta demandada evitar que el aceite llegase al río, y asumiendo que le fuese imposible evitarlo, practicar entonces las diligencias necesarias para prevenir a los que razonablemente calculase que pudiesen utilizar las aguas.

Se arguye por la demandada Plazuela Sugar Co. que ella no es legalmente responsable del daño que alega haber sufrido el demandante, y que su negligencia, de haber existido, no fué la causa próxima del accidente, puesto que intervino un agente independiente que de no haber intervenido, ningún daño hubiera sufrido el demandante.

Para que pueda sostenerse con éxito que el daño causado a otro es el resultado de la intervención de un agente independiente, es requisito *sine qua non* que al tiempo de ponerse en acción la fuerza que culminó en el daño, no existiera todavía el agente independiente, o en caso de existir ya, lo ignorase el demandado y no pudiese razonablemente preverlo, pues en caso de existir entonces y conocerlo el demandado, o no conociéndolo pudiendo razonablemente preverlo, entonces el supuesto agente independiente no es otra cosa que una situación de hecho o circunstancia que debió tener en cuenta

el demandado al actuar o dejar de actuar en la forma en que lo hizo. *Bohlen & Harper on Torts*, 262, 270 (sec. 119). Véase al mismo efecto el artículo que bajo el título "Proximate Cause" publicó el Profesor James Angell McLaughlin en 39 Harvard Law Review 149, 159. No puede sostenerse, por consiguiente, que el río Santiago fuese el agente independiente sin cuya intervención no se hubiera causado el daño.

Que el aceite combustible que ingirió el ganado del demandante era nocivo, quedó suficientemente establecido por la preponderancia de la evidencia. Prueba de ello es el concurso de las siguientes circunstancias: coincidir la enfermedad del ganado del demandante, en número considerable, tanto vacuno como caballar, con la existencia de manchas de aceite en la superficie del río donde abrevaba; enfermar al mismo tiempo ganado del testigo José Colón; presentando síntomas idénticos a los que presentaba el ganado del demandante, después de haber bebido las mismas aguas; el experimento practicado por el químico Sr. del Valle; y finalmente las aseveraciones contenidas en la obra *"A Petroleum Handbook Compiled by Members of the Royal Dutch Shell Group"*, a que se refirió el químico del Valle en su testimonio de refutación (*rebuttal*).

Es verdad que ningún testigo vió beber al ganado del demandante; pero es éste un hecho que no es necesario probar con evidencia directa. De la evidencia no controvertida del demandante resulta que hacía tiempo su ganado apacentaba en la finca anteriormente mencionada, y como es sabido que el ganado diariamente toma agua, siendo el río el único sitio donde bebía, preciso es concluir que el ganado bebió, como de costumbre, en el sitio donde diariamente lo hacía, como lo indica el hecho de que en sus patas y en el hocico presentaba manchas de aceite. No se probó que antes de aquella fecha se hubiese derramado aceite en el río, que el ganado del demandante hubiese sufrido igual o parecida enfermedad, ni que hubiese ingerido ninguna otra sustancia o alimento distinto del acostumbrado. En fincas como la del

demandante, dedicadas a apacentar ganado, generalmente no existen yerbas nocivas, pues se tiene buen cuidado, tan pronto se descubre alguna, de arrancarla inmediatamente; pero asumiendo que en aquella fecha hubiera crecido alguna yerba de esta clase, lo natural era que no fueran tantas las cabezas de ganado que la comieran, y hubiera sido también rara coincidencia que el ganado de José Colón, en otra finca distinta, a alguna distancia de la del demandante, hubiese comido al mismo tiempo la misma yerba. Si los litigantes tuviesen que probar sus casos con exactitud matemática, raras veces podría hacerse justicia. Por eso la Ley de Evidencia, en su artículo 4 (Código de Enjuiciamiento Civil de 1933, artículo 366) dispone:

"La ley no exige aquel grado de prueba que excluyendo la posibilidad de error produzca absoluta certeza, porque tal prueba es raras veces posible. Sólo exige la certeza moral o un grado de prueba que produzca convicción en un ánimo no prevenido."

Véase también *P. R. Fruit Exchange* v. *Caul*, 35 D.P.R. 522.

■ Es cierto que en su opinión la corte sentenciadora se expresó así:

"Hay prueba pericial en los autos en cuanto al efecto tóxico del petróleo (*fuel oil*) y también constan en los autos los experimentos hechos en nuestra presencia, en peces, y los hechos con tres bueyes en una finca de Toa Baja. Realmente, a juzgar por este experimento, no podemos determinar si el *fuel oil que ingirieron los bueyes que sirvieron de base a nuestro experimento* sea una sustancia tóxica; en buena lógica tenemos que concluir que no lo es; pero nada excluye la posibilidad de que tal sustancia ocasione la muerte de los peces pequeños y que éstos contaminen las aguas del río, haciéndolas impropias para el consumo de animales y ocasionándoles enfermedades y aún la muerte. *El hecho cierto es que la prueba del demandante no está contradicha en cuanto a la pérdida del ganado.*" (Legajo de sentencia, pág. 39.) (Bastardillas nuestras.)

Convenimos con los demandados apelantes en que cometió error la corte sentenciadora al basar sus conclusiones en

una teoría distinta de la expuesta en la demanda y en el pliego de particulares; pero existiendo como existe en el récord prueba suficiente para sostener que la causa del envenenamiento fué la alegada en la demanda y en el pliego de particulares, es decir, el haber ingerido el ganado el aceite combustible, al tomar agua, el error de la corte en la apreciación de la prueba no produce revocación ni debe perjudicar al demandante. Es conveniente observar que la corte no resuelve que el aceite que ingirieron los bueyes del demandante no fuera tóxico. Lo que resolvió la corte fué que el *fuel oil* que ingirieron *los bueyes que sirvieron de base al experimento de los demandados* no era una sustancia tóxica, con lo cual estamos conformes.

Pasemos ahora a considerar los señalamientos de error 3 y 4, dejando el 7°., que se refiere al montante de los daños, para estudiarlo al considerar la apelación establecida por el demandante.

El hecho de que el demandante fuese dueño o sólo arrendatario de los terrenos que menciona en la demanda es completamente inmaterial a las cuestiones en controversia, pues no se reclaman daños a la propiedad inmueble, sino al ganado perteneciente al demandante. Por consiguiente, no es necesario considerar si el terreno donde apacentaba el ganado era propiedad del demandante o lo poseía a título de arrendatario.

El efecto legal de esta discrepancia entre las alegaciones de la demanda y el pliego de particulares es enmendar la primera de forma que exprese que las fincas radican en los barrios que se mencionan en el pliego de particulares, debiendo la prueba del demandante, como en el presente caso se hizo, limitarse a las especificaciones del pliego de particulares. Véanse 21 R.C.L. 480 *et seq.; Anderson* v. *Rucker Bros.,* 8 A.L.R. 544 y la monografía que le sigue: *Bloom* v. *Nathan Vehon Co.,* 72 A.L.R. 232. Por consiguiente, actuó correctamente la corte sentenciadora al permitir al demandante y sus testigos que en sus declaraciones se refiriesen a

las fincas poseídas por el demandante como radicadas en los barrios Hato Abajo y Hato Arriba, de Arecibo.

Como anunciáramos al mencionar la presentación en evidencia del acta notarial sobre la toma de muestras de aceite combustible, los demandados alegaron que tal prueba era inadmisible, toda vez que su admisión les privaba de su derecho a repreguntar al notario con relación a los hechos certificados por él. Esta cuestión no aparece levantada en el señalamiento de errores de los demandados ni mencionada en ninguna parte de su alegato, lo que nos autorizaría a considerarla como abandonada. Pero siendo el acta notarial la base sobre la cual descansa el informe pericial del Sr. del Valle Sárraga, puesto que la muestra que recogió, certificó y le remitió al notario fué la que utilizó el perito para el estudio que le llevó a la conclusión de que el aceite combustible (*fuel oil*) es tóxico, estimamos conveniente estudiar la admisibilidad de esta evidencia.

Si se tratase de otro documento suscrito por persona particular o por cualquier otro funcionario no investido con la fe notarial, tendríamos que aceptar la contención de los demandados apelantes. Pero se trata de un acta notarial otorgada con todas las solemnidades legales, y nuestra ley concede entero crédito a todas las manifestaciones que hace el notario basadas en sus observaciones personales o los actos realizados por él, a menos que el que los impugne demuestre satisfactoriamente su falsedad.

El conocido autor Miguel Fernández Casado, en su obra "Tratado de Notaría", tomo 1, pág. 395, sección 448, nos da la siguiente definición del acta notarial:

"Acta notarial es el instrumento público que contiene la exacta narración de un hecho *capaz de influir en el derecho de los particulares* y levantada por requerimiento de otra persona." (Bastardillas nuestras.)

Refiriéndose al valor probatorio del acta notarial, dice el citado autor:

"La ley concede al testimonio notarial el valor de una prueba plena, y el documento adquiere presunción de veracidad." Obra citada, pág. 583.

Más adelante, ilustrando los actos u observaciones que pueden ser objeto de un acta notarial, se expresa así el mismo autor:

"El notario, en el acta notarial, certifica ciertos hechos del requirente, de terceras personas, o bien de fenómenos físicos comprensibles, sin otro auxilio que el de los sentidos—especialmente de los de la vista y el oído—y el de los conocimientos vulgares de la vida; la entrega por el requirente de una carta, la entrada de otra persona en un local, o la salida de él, la inhumación o exhumación de un cadáver, la hora que señala un reloj en un momento dado, el hallarse abierta o cerrada una puerta a tal hora, pueden servir de ejemplo *de los hechos testificables por acta notarial.*" Tomo 1, pág. 584. (Bastardillas nuestras.)

Esta facultad o privilegio del notario la consagra nuestra Ley Notarial, aprobada el 8 de marzo de 1906, posterior, por consiguiente, a la Ley de Evidencia, en su artículo 1 (Comp. 1911, art. 1979), que dice así:

"Art. 1. El notario es el único funcionario autorizado para dar autenticidad, conforme a las leyes, a los contratos y *demás actos extrajudiciales que ante su presencia se realicen.*"

Es obvio que los "*actos extrajudiciales que en su presencia se realicen*" a que se refiere el precepto legal transcrito, son los de la índole de los que ilustra Fernández Casado en la cita anterior, a los cuales pueden agregarse las manifestaciones y actos realizados por el notario, objeto del acta notarial que nos ocupa.

Armonizando con nuestra ley notarial, el Código Civil (edición 1930), en su artículo 1172, igual al 1218 del español, en lo pertinente dice así:

"Los documentos públicos hacen prueba aún contra terceros *del hecho que motiva su otorgamiento y de la fecha de éste.*
".       .       .       .       .       .       .       .       .       .""

Comentando Manresa el artículo 1218 del Código Civil español, dice así: .

"Determinado quién ha de considerarse como tercero, no ofrecen duda las declaraciones del art. 1218: la escritura pública, el documento público en general, *hace prueba plena, incluso contra aquél, si no se demuestra la falsedad del hecho que el funcionario presencia y autoriza, y de la fecha que consigna en el documento; pero no la hace en cuanto a la exactitud de las manifestaciones que en el documento consignen los interesados.*

"Consecuencia de esto es el escaso valor de las actas notariales *en que el notario se limita a dar fe de que ante él han expresado su testimonio algunas personas, puesto que esta expresión, único fondo del documento, no adquiere, por consignarse en éste, eficacia de prueba documental, sino que conserva su naturaleza propia de mero testimonio, inferior por cierto en tal forma a la prueba testifical,* puesto que no hay la garantía del juramento y falta la intervención de las partes a quienes pudiera perjudicar lo dicho y consignado en el acta." Manresa, "Comentarios al Código Civil", ed. 1907, tomo 8, pág. 465. (Bastardillas nuestras.)

En resumen, el acta notarial que como la de este caso certifica lo que el notario presenció e hizo, es *prueba plena incluso contra tercero* de los hechos presenciados o actos realizados por el notario, así como de la fecha que consigna en el documento. Claro es que en las escrituras donde el notario da fe de las manifestaciones que ante él hacen otorgantes y testigos, el notario no acredita ni tiene facultad para acreditar la exactitud de tales manifestaciones. Sólo acredita, y en cuanto a esto su certificación hace prueba plena, que los otorgantes y testigos hicieron ante él las manifestaciones que consigna en el documento público, manifestaciones que pueden ser falsas o verdaderas y las cuales obligan y constituyen prueba solamente entre las partes que las hicieron.

A nuestro juicio, tratándose como en este caso se trata de un acta notarial en que el notario certifica actos realizados y observaciones hechas por él en su carácter de notario, no

cometió error la corte sentenciadora al admitir la evidencia ofrecida por el demandante.

Consideraremos ahora los errores 1 y 2 señalados por el demandante y el séptimo de los demandados, o lo que es igual, determinaremos el montante de los daños que alega haber sufrido el demandante.

La corte sentenciadora en su opinión, luego de rechazar ciertas partidas de daños reclamados por el demandante, tales como la de $8,000 que mencionaremos más adelante y la de alquiler de bueyes para la terminación de la zafra, estima que los daños sufridos por el demandante ascienden a la cantidad de $3,000, sin que podamos determinar qué factores tomó en consideración para llegar a esa conclusión.

Los demandados presentaron en evidencia copias certificadas de las declaraciones de propiedad radicadas en el Departamento de Hacienda por el demandante, para los ejercicios de 1929–30 y 1930–31 (T. de E. 1005 y 1089–1092 ambas inclusives), de las cuales no aparece que el demandante declarase ganado alguno. A nuestro juicio, esta prueba no es concluyente y no puede ir contra la realidad de los hechos, surgiendo como surge claramente de la evidencia, que el demandante tenía ganado tanto vacuno como caballar. Si a los efectos de estimar los daños tenemos que descansar en la declaración del demandante en lo que respecta al número de cabezas de ganado, cúlpese a sí misma la demandada, que pudiendo haberlo examinado oportunamente al ser notificada por el propio demandante el día que descubrió la enfermedad, no lo hizo, demostrando no tener interés alguno en la pérdida que alegaba entonces el demandante.

Entre las partidas de daños reclamados por el demandante se halla una por $8,000 por *"otras pérdidas y trastornos en sus negocios y quebrantamiento del crédito,"* que fué rechazada en su totalidad por la corte sentenciadora. Como el demandante está conforme con la resolución de la corte, en lo que a ese extremo respecta. (alegato dte. apte. 8–10), no

nos detendremos a considerarlo, aceptando desde luego la conclusión de la corte sentenciadora.

Consideraremos en primer término los perjuicios causados al demandante por la muerte de las nueve cabezas de ganado caballar, a saber: (1) una yegua pura sangre denominada ''Ponce First''; (2) cría de la yegua Ponce First y Marqués de la Plata, de dos meses de edad; (3) yegua Usera (no era pura sangre); (4) cría de la yegua Usera y Marqués de la Plata, de dos meses de edad; (5) yegua Maruca, próxima a parir, fecundada por Marqués de la Plata; (6) cría de Malvaloca (no era pura. sangre) con Marqués de la Plata; (7) potranca Liberty (no era pura sangre); (8) yegua Ruiz Soler (pura sangre); (9) cría de la yegua Ruiz Soler y Marqués de la Plata, de dos meses de edad.

De la prueba del demandante surgió que estos animales se alimentaban de pasto natural y no comían avena ni ningún otro alimento concentrado.

Según el perito del demandante, estos animales tenían un valor mínimo de $5,950, tasándolos en la siguiente forma: Núm. 1, $300; núm. 2, $900; núm. 3, $150; núm. 4, $200; núm. 5, $800; núm. 6, $1,200; núm. 7, $1,200; núm. 8, $200; núm. 9, $1,000.

Declaró el perito de los demandados, sin ser contradicho, que un caballo que no ha sido criado con alimento concentrado no tiene valor alguno como caballo de carreras, toda vez que la especialidad a que se dedican estos animales requiere que desde que están en el vientre de la madre sean bien alimentados para que nazcan y crezcan fuertes y vigorosos y puedan así resistir la dura prueba a que son luego sometidos en los hipódromos. Sostuvo el perito que desde que la yegua es fecundada se le dan alimentos concentrados y que un potro de un año se come unas diez libras de avena diariamente, distribuídas en tres piensos. Considerando que el ganado caballar del demandante sólo comía pasto natural, valoró los potros de dos meses a razón de $50 cada uno, asegurando que no tenían valor como caballos de carreras, y

las yeguas pura sangre dedicadas a crianza, aunque estuvieren fecundadas, las estimó en no más de $300 cada una.

Del estudio que hemos hecho de la prueba pericial relativa a este ganado, opinamos que la pérdida sufrida por el demandante con motivo de la muerte de las nueve cabezas de ganado caballar razonable y justamente puede estimarse en la cantidad de $1,300, que se descompone así: Núm. 1, $300; núm. 2, $50; núm. 3, $100; núm. 4, $50; núm. 5, $200; núm. 6, $50; núm. 7, $200; núm. 8, $300; núm. 9, $50. (Se sigue el orden en que se nombran anteriormente.)

El demandante estimó la pérdida de 35 bueyes de trabajo en $3,200, o sea a razón de $91.42 cada buey. Este cálculo del demandante es indudablemente exagerado. Los demandados no presentaron prueba sobre el valor del ganado vacuno, pero no estamos obligados a aceptar ciegamente la valoración dada por el demandante. Los 35 bueyes equivalen a 17½ yuntas. Calculando un promedio de $140 por yunta, o $70 por cada buey, el valor razonable de los 35 bueyes es $2,450.

Perdió el demandante, según su declaración, no contradicha por los demandados, 21 vacas que valoró en $2,500. Según el demandante.estas vacas estaban horras (T. de E., 273). No se probó que fuese ganado de raza ni existe evidencia alguna de la edad o partos que tuvieran, incumbiendo al demandante, al presentar su prueba, suministrar los datos necesarios para poder apreciar razonablemente su valor. Estimando estas vacas a razón de $70 por cada una, su valor total sería de $1,470.

Perdió además el demandante ocho novillas que valoró en $300, cinco novillos que estimó en $240 y 17 becerros que apreció en $136. No existiendo razón alguna para rechazar esta valoración, la aceptaremos como razonable, ascendiendo así la pérdida de todo el ganado vacuno a la cantidad de $4,596.

La partida de $648 reclamada por el demandante, que representa lo pagado por él al Sr. Correa por concepto de al-

quiler de bueyes para terminar la zafra, fué rechazada por la corte inferior, por estimar que dichos bueyes fueron alquilados desde el mes de noviembre de 1929, según la declaración de Correa, o sea unos cinco meses antes del envenenamiento del ganado, y que por consiguiente la necesidad de este gasto no podía atribuirla a acontecimientos surgidos con posterioridad, en marzo de 1930.

A nuestro juicio no debemos alterar el resultado a que llegó la corte sentenciadora al rechazar esta partida, pues habiendo muerto los bueyes y condenándose a los demandados a devolver su valor al demandante, no procede, en adición al valor, recobrar indemnización por los servicios que dicho ganado dejó de prestar. *Rodríguez* v. *Martínez, Jr.,* 55 D.P.R. 59.

Tampoco nos satisface la prueba de la partida de $478.83 por retardo en el desarrollo del ganado enfermo que sobrevivió, ni la relativa a desembolsos para cuido del ganado, pues de la prueba del demandante sólo resulta que obtuvo en la botica medicinas, consistentes en sulfato de soda, magnesia calcinada, crema de bismuto, semillas de lino, jabón de Castilla y tintura de opio (T. de E. 1077, 1078), pero no se probó qué cantidad compró de dichas medicinas, el precio que pagó por ellas ni qué cantidad satisfizo a los peones que según él cuidaban este ganado.

Lo expuesto nos conduce a la conclusión de que los daños sufridos por el demandante con motivo de la negligencia de la demandada Plazuela Sugar Co. ascienden a la cantidad de $5,896, o sea $1,300 por la pérdida de los caballos; $2,450 por la de los bueyes; $1,470 por la de las vacas, y $300, $240 y $136 por la de las novillas, novillos y becerros respectivamente.

Considerando ahora el tercer señalamiento de error alegado por el demandante, que se contrae a haber dejado la corte sentenciadora de condenar a las demandadas al pago de honorarios de abogado, convenimos con el demandante en que la corte sentenciadora no hizo buen uso de su discreción

al no conceder al demandante honorarios de abogado, pues de la prueba resulta que la demandada Plazuela Sugar Co. fué temeraria en la defensa de este pleito. Si ella, en vez de permanecer indiferente a las pérdidas alegadas por el demandante, hubiera examinado el ganado y comprobado los perjuicios realmente sufridos por el demandante, con toda probabilidad hubieran llegado a un acuerdo con respecto al montante de los daños y se hubiera evitado al demandante la institución de este pleito, que indudablemente le ha irrogado gastos de consideración.

*Por lo expuesto, procede desestimar, por académico, el recurso de los demandados en el caso 7884, interpuesto contra la resolución de la corte inferior aprobando la exposición del caso sometida por el demandante; declarar con lugar los recursos interpuestos por Manuel Sierra Rodríguez y The Shell Co. (P. R.) Ltd. en el caso número 7720; revocar la sentencia dictada contra dichos dos demandados; desestimar el interpuesto por Plazuela Sugar Co. en el mismo caso 7720; y modificar la referida sentencia, contra la cual apeló el demandante en el caso 7721, condenando a Plazuela Sugar Co. a pagarle la cantidad de $5,896.00 más las costas y $500 por concepto de honorarios de abogado, y así modificada, confirmarla.*

El Juez Asociado Sr. Wolf está conforme con el resultado.[*]