DOMINGO, JUAN y JUANA MARÍA MATOS RODRÍGUEZ, demandantes, apelados y apelantes, *v.* CÁNDIDO SALVAT MALDONADO, IRAIDA MEDINA VDA. DE MATOS y la SUCESIÓN DE FRANCISCO o FROILÁN MATOS RODRÍGUEZ, ETC., demandados, apelantes y apelados.

Núm. 8078.—*Sometido:* Mayo 3, 1940. *Resuelto:* Mayo 22, 1940.

*Antonio E. Suliveres,* abogado de los demandados, apelantes y apelados; *Luis Mercader,* abogado de los demandantes, apelados y apelantes.

---

* NOTA: Véase el prefacio.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

La principal cuestión a resolver en los recursos que una y otra partes han interpuesto en este caso, es si la corte sentenciadora cometió error manifiesto en la apreciación de la prueba.

La de los demandantes tiende a demostrar que Jaime Matos, policía insular, adquirió desde hace varios años, en parte a título de herencia y el resto por compra, dos fincas rústicas de 33.60 y 19.40 cuerdas respectivamente, radicadas en el término municipal de Utuado. No pudiendo administrarlas personalmente por impedírselo sus deberes oficiales, encargó de ello, desde que las adquirió, a su hermano Froilán Francisco Matos, quien las cultivaba y vivía en una de ellas con su esposa e hijos.

No resulta de la prueba que Jaime Matos pagase a su hermano un sueldo determinado por los servicios que le prestaba, pero sí aparece que atendía a todas las necesidades de Froilán y su familia.

Con posterioridad a la adquisición de las fincas, contrajo matrimonio con Iraida Medina, enfermera de profesión, viviendo el matrimonio del sueldo que uno y otra ganaban en sus respectivas ocupaciones. No tuvieron hijos y continuaron viviendo en la población. Después de varios años de casados, fué trasladado de Utuado al pueblo de Jayuya, donde fué muerto pocos días después, allá por el año 1935. No teniendo descendientes ni ascendientes, deberían heredarle sus hermanos. A su muerte, quedaron en poder de su viuda Iraida Medina varios documentos, entre ellos un pagaré al portador, suscrito por Jaime Matos, el 8 de mayo de 1934, pagadero a su presentación y garantizado con hipoteca sobre las dos fincas mencionadas. Algún tiempo después, su viuda, que ningún interés tenía en las dos fincas por ser bienes privativos de su esposo y haber recibido ella del Gobierno, según declaró, unos $4,000 por concepto de indemnizaciones con motivo de la muerte de su marido, entregó el pagaré a

Froilán, quien, según ella, lo pidió para llevar a cabo ciertas gestiones en relación con unas escrituras. Dos años después murió Froilán y el pagaré vino a poder de Cándido Salvat, casado con una hermana de la viuda de Froilán. Una vez en posesión del pagaré, Salvat instó un procedimiento sumario ejecutivo para su cobro, procedimiento que culminó en la adjudicación de las dos fincas al acreedor en satisfacción del pagaré. No obstante esta adjudicación, la viuda de Froilán ha continuado viviendo en las fincas, realizando actos de dominio sobre ellas, como si tal adjudicación no se hubiera efectuado.

Los demandantes, hermanos de Jaime, instaron este pleito para que se decretase la nulidad del procedimiento ejecutivo y la consiguiente adjudicación de las fincas a Salvat, y se condenase además a los demandados al pago de los frutos producidos por dichas fincas.

La prueba de los demandados tiende a demostrar que dos meses después de suscribir el pagaré, Jaime fué donde su hermano Froilán y deseando retribuirle los servicios que por varios años le había prestado en la administración de las fincas, se lo entregó, declarando unos unas veces que la entrega fué absoluta y otras que lo dió en garantía, sin que en manera alguna resulte que se hiciera liquidación alguna o se señalase determinada cantidad como montante de la supuesta deuda.

Conviene consignar aquí que la viuda de Froilán, declarando por los demandados, aseguró que su esposo cogía los frutos que producían las fincas, que Jaime no percibía nada de ellas y que este último vivía de lo que él y su esposa ganaban (T. de E. 187).

Dos años después de la muerte de Jaime falleció Froilán después de una prolongada enfermedad, pero antes de morir llamó a su casa a Cándido Salvat, y como el primero, según los demandados, adeudaba al segundo unos $1,400 más o menos por concepto de provisiones tomadas en el "ventorrillo" de Salvat y por refacción de las fincas, para lo

cual en ocasiones, según los demandados, le tomó hasta $25 semanales, entregó el pagaré a Salvat con encargo de que al ejecutar las fincas hipotecadas devolviese a su esposa e hijos cualquier cantidad que en exceso de los $1,400 produjese la subasta; y en caso de que no se presentasen postores y se le adjudicasen las fincas, les diese entonces la cantidad de $1,000 en efectivo. Ningún documento se formalizó para acreditar este convenio. Después de adjudicadas las fincas a Salvat, según él y la viuda de Froilán, en cumplimiento de lo pactado entregó aquél a la viuda $650 en efectivo, y como arrendó a ésta las fincas a razón de $250 anuales pagaderos por adelantado, retuvo dicha cantidad, quedando a deber a la viuda de Froilán, de acuerdo con el pacto celebrado con su esposo, la cantidad de $100.

La corte inferior no creyó la prueba de los demandados, y comentándola se expresó así:

"La explicación de la parte demandada para demostrar cómo el pagaré vino a poder de Salvat, mientras más se considera, menos convence. Es una historia mal ideada y peor expuesta." (L. de S. pág. 28.)

Más adelante, en el curso de su opinión, analizando la misma prueba, dijo:

"Salvat declaró que para la fecha en que adquirió el crédito de $3,500, sólo tenía declarada como contribución una pequeña finca. Lo que pagaba de contribución por ella demuestra que no tendría un valor de más de quinientos dólares. Declaró, además, que para esa época trabajó en la P.R.R.A., ganando noventa dólares. Es difícil concluir que él pudiera realizar los negocios con los cuales pretende explicar su adquisición del crédito hipotecario.

"Además del parentesco de Salvat con Angela Matos, hay otra circunstancia que ayuda a la convicción de que el traspaso fué simulado. Salvat nunca tomó posesión de las fincas después de ejecutarla judicialmente. La viuda de Francisco Matos y sus hijos han continuado poseyéndolas hasta el presente. Se presentó como prueba un documento que pretende ser un arrendamiento hecho por Salvat a la viuda de Francisco. Este documento se hizo después de presentada la primera demanda en este litigio. Basta leer la afirmación

que hace la parte demandada al final de su contestación, diciendo que las fincas nunca han producido para pagar el dinero que se invierte en ellas, para concluir que el canon anual de doscientos cincuenta dólares, y las contribuciones, que se consignó en el referido contrato de arrendamiento, fué una suma caprichosa, que nunca podría pagar la supuesta arrendataria.''

La prueba de los demandados nos convence de que el juez sentenciador dirimió correctamente el conflicto de la prueba al resolverlo a favor de los demandantes. Veámoslo.

Consideremos primero la versión de los demandados sobre la manera en que el pagaré al portador llegó a manos de Froilán. De la declaración de la viuda de éste, quizás la más autorizada para declarar sobre la cuestión, por lo que no debemos ponerla en duda—siendo como es una de los demandados—, resulta que Froilán percibía el producto de las fincas y que Jaime Matos no percibía nada, pues él vivía de su sueldo y de lo que ganaba su esposa, que como resulta de la prueba, era enfermera y trabajaba en el Hospital Municipal de Utuado. Si esto era así, ¿qué deuda podía tener Jaime con Froilán por concepto de administración de las fincas, que necesitase retribuir con una cantidad que según la prueba de los demandados era mayor que el valor de las propias fincas? Por el contrario, era Froilán quien gratuitamente se había beneficiado con los bienes de su hermano, y si alguien era deudor, debería serlo Froilán y no Jaime Matos, que ningún beneficio personal había recibido del trabajo de su hermano. En segundo término, asumiendo sin aceptarlo que Jaime Matos quisiera beneficiar a su hermano, ¿a qué entregarle un pagaré al portador garantizado con hipoteca, vencedero a su presentación, exponiéndose de ese modo a que su hermano pudiese endosarlo e inmediatamente le ejecutasen las fincas sin consideración alguna? Si su propósito era ayudar a su hermano, más fácil le hubiera sido entregarle una cantidad en efectivo, reconocer adeudarle determinada suma o en último extremo donarle una parte de las fincas, cosa que podía hacer fácilmente por tratarse de bienes privativos suyos y carecer de herederos forzosos.

Consideremos ahora cómo llegó el pagaré, según los demandados, a poder de Salvat. Resulta de la prueba que la esposa de Salvat era hermana de la de Froilán; que Salvat era un hombre de escasos medios económicos y que el establecimiento donde Froilán llegó a tomar la respetable suma de $1,400 era un "ventorrillo" de campo, como declaró el propio Salvat, manifestando algunos testigos de los demandantes que tenía unas veces existencias por valor de $25, otras por $50, y a veces nada tenía. Aparte de estas circunstancias, es difícil creer, asumiendo la existencia de la deuda, que Froilán, un hombre de experiencia, necesitando y adeudando dinero, se guardara un pagaré por espacio de tres años (murió en 1937), no hiciera diligencias para cobrarlo o negociarlo, y al sentir que se aproxima el fin de su vida, llame al acreedor para entregarle un valor que asciende a casi el doble de la deuda, poniendo así el destino de su familia a merced de su acreedor, sin ocuparse siquiera de que se consigne por escrito lo pactado, cosa que le hubiera sido fácil puesto que según la prueba de los demandados la transacción se llevó a efecto en presencia del testigo Álvarez, profesor de instrucción pública, y quien a instancias de los demandantes finalmente admitió que un hermano suyo se hallaba casado con una hermana de Salvat.

Arguyen los demandantes que la corte sentenciadora erró al desestimar la demanda en cuanto a la segunda causa de acción, que se refiere a los frutos producidos y que erró también al no condenar a los demandados al pago de los honorarios de abogado.

Refiriéndose a dicha segunda causa de acción, la corte sentenciadora se expresó así:

"La parte demandante no presentó prueba específica y convincente en que pudiéramos fundar una decisión justa con respecto a la segunda causa de acción sobre daños y perjuicios."

Tiene razón la corte sentenciadora. Los únicos testigos que declararon sobre este extremo fueron Daniel Ramos

Matos y Domingo Matos Rodríguez. Del examen de repreguntas del primero tomamos lo siguiente:

"P. Cuando el ciclón de San Felipe, ¿vió esa finca de Jaime Matos?—Ver por dentro no.

"P. Después de San Felipe, ¿la ha volteado?—Tampoco.

"P. ¿Y sin voltear la finca dice que puede producir cuatro quintales de café?—Es el promedio. Le hablo de un promedio y puede dar más y menos.

"P. Y antes de San Felipe, ¿no vió la finca?—He pasado.

"P. ¿Por el camino?—Sí, señor.

"P. ¿No sabe cuántas cuerdas hay sembradas de frutos menores? —Que paso para mi finca y del camino veo parte.

"P. ¿No sabe las cuerdas que hay?—No, señor.

"P. ¿Cómo dice que hay ocho cuerdas de café si hace diez años que no ve la finca?—Es un cálculo.

"P. ¿Tampoco sabe lo que se sembró de tabaco?—Jaime Matos me dijo.

"P. Lo que sepa de conocimiento propio.—Creo que se sembraban...

"P. Creo no, lo que ha visto.—No voy a voltear...

"P. ¿Y por qué cree que se sembraban de once a doce cuerdas? —Una vez él dijo...

"P. ¿Quién?—Jaime Matos.

"P. No me diga lo que dijo él. ¿Los conocimientos que tiene de eso es porque Jaime Matos se lo dijo?—Sí, señor, que le habían tocado once cuerdas.

"P. ¿Desde antes del ciclón no ha visto la finca?—Bien, he pasado." (T. de E., pág. 103.)

De la del segundo, también tomamos de su examen de repreguntas:

"P. ¿Sabe cuánto café se cosechó el año pasado en esa finca?— No sé definitivamente, porque no tomé nota.

"P. El año atrasado, ¿sabe cuántos quintales se cogieron en esas dos fincas?—Tampoco.

"P. Y en el año 1935, ¿sabe los quintales de café que produjo esa finca?—No, señor.

"P. ¿Lo que hace es un cálculo de acuerdo con la plantación, con la siembra y palos que hay allá, pero no sabe lo que produjo?...

"P. ¿Usted sabe si el año pasado hizo una cosecha mala o buena?—Regular.

"P. ¿No ha oído decir a todos los agricultores que era mala y quejándose que estaban arruinados?—Sí, señor; pero las cosechas no son malas todos los años.

"P. ¿Pero en comparación?—Regular. No sería de las mejores, pero no de las más malas.

"P. ¿No sabe cuánto produjo esa finca? ¿Cuánto había sembrado de batatas en esa finca?—Tres cuerdas.

"P. ¿Y de café, ocho?—Sí, señor.

"P. De guineos, ¿cuántas?—Tres cuerdas también.

"P. Dice que se produjo once cuerdas de tabaco. ¿Cuántas se sembraron el año pasado?—Once cuerdas.

"P. ¿Cuánto tabaco produjo?—Allí no baja de seis a siete quintales.

"P. ¿Sabe la liquidación que hubo del tabaco?—No me ocupé.

"P. ¿No sabe si se quedó a deber del tabaco o si dió beneficio?—No lo sé.

"P. ¿Es agricultor de tabaco?—Sí, señor."

(T. de E., 131, 132.)

■ Convenimos con los demandantes en que en un caso como éste, en que no sólo ha existido temeridad, si que hasta mala fe por parte de los demandados al pretender privar a los demandantes de lo que legítimamente les pertenece, no hizo buen uso de su discreción la corte sentenciadora al no conceder a los demandantes una cantidad razonable por concepto de honorarios de abogado, a pesar de que entre los demandados se encuentran dos menores de edad.

■ Se quejan los demandados de que la corte sentenciadora admitió en evidencia el acta de requerimiento que hicieron los demandantes por medio del notario F. Figueroa Maestre a la demandada Iraida Medina viuda de Jaime Matos; que erró también al permitir al Notario y a uno de los testigos declarar sobre el contenido del acta, la que según los demandados es nula por no haber sido firmada por la requerida, y además porque el notario autorizante era entonces abogado de los demandantes, alegando también que las manifestaciones que hiciera Iraida Medina eran comunicaciones privilegiadas por tratarse de que ella era en aquel momento

la cliente del notario. El hecho de que el acta notarial no hubiese sido firmada por la requerida no la hace inadmisible como prueba. El notario da fe de las manifestaciones que en su presencia hizo la requerida y es la fe del notario y no la firma de la requerida la que da valor probatorio al acto. Véase *Colón* v. *The Shell Co. (P.R.) Ltd.*, 55 D.P.R. 592, 622.

Pero prescindiendo de la admisibilidad del acta y de la declaración del testigo Figueroa Maestre, la declaración de Daniel Matos Ramos, independientemente del acta y de la declaración de Figueroa Maestre, tiende a demostrar que el pagaré al portador, según la manifestación de Iraida Medina, estuvo en manos de ésta por algún tiempo después de la muerte de su esposo. Tomamos de la declaración de dicho testigo:

"P. Ese vale hipotecario, ¿dónde quedó a la muerte de Jaime Matos?—En poder de la señora, de Iraida Medina.

"P. ¿Cómo sabe que quedó en poder de ella?—En primer lugar, sabíamos que estaba allí.

"  *        *        *        *        *        *        *

"P. ¿Cómo lo sabe?—Tuvimos cierta reunión y ella declaró y dejó todos sus papeles y se le encargó que los conservara.   (T. de E., pág. 93.)

"  *        *        *        *        *        *        *

"P. Después que murió él (Jaime Matos), ¿cómo sabe que quedó en poder de la viuda?—Tuvimos cierta reunión y ella manifestó los papeles y lo que tenía ella pendiente y entre ellos el vale hipotecario.

"P. ¿Se reunieron para eso?—Sí, señor; tuvimos varias reuniones y se autorizó para que lo guardara.

"P. ¿Además de ese vale, tenía algo más?—Las escrituras.

"P. ¿De qué?—De las fincas.

"P. ¿Todos la autorizaron para que los siguiera guardando?—Sí, señor.

"P. ¿Ella continuó en posesión de ese vale al portador y documentos?—Siempre.

"P. ¿Hasta cuando?—Hasta por el 1937 que supimos que el vale no estaba en su poder de ella.   (T. de E., pág. 94.)

Asumiendo que la corte hubiese errado al admitir el acta y permitir declarar al notario Figueroa Maestre, tal error, de haberse cometido, no pudo perjudicar a los demandados, puesto que descartando esa evidencia, la declaración del testigo Ramos prueba suficientemente las manifestaciones que hiciera Iraida Medina al efecto de que a la muerte de su esposo tenía en su poder el pagaré en controversia. Pero podemos ir más lejos aun y hasta descartar por completo la declaración del testigo Daniel Ramós, toda vez que el resto de la evidencia que ante sí tuvo el juez sentenciador es tan preponderante que por sí solo basta para sostener la sentencia dictada.

*Por lo expuesto, procede modificar la sentencia apelada en el sentido de condenar además a los demandados al pago de $200 por concepto de honorarios de abogado, y así modificada, confirmarla.*