M. León Parra y María R. Vda. de Guillermo León Parra, demandantes y apelados, *v.* Juan J. Gerardino, demandado y apelante.

Núm. 8032.—*Sometido:* Febrero 14, 1941. *Resuelto:* Abril 18, 1941.

490

*Felipe Colón Díaz,* abogado del apelante; *M. León Parra, pro se,* y *Ramón A. Gadea* y *Rafael Hernández Matos,* abogados de los apelados.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Versa este pleito sobre reclamación de daños y perjuicios que los dueños de una casa alegan que les causó su arrendatario al realizar ciertos actos y dejar de cumplir con determinadas obligaciones que expresamente asumiera al arrendar el inmueble.

Se alega por los demandantes que son dueños de una casa situada en Ponce que se arrendó al demandado haciéndose

constar por escritura pública que se encontraba dedicada a vivienda de familia, pintada de aceite, con sus puertas y persianas, etc., en la forma que se expresa y que habiendo el demandado alterado sus condiciones interiores para dedicarla a negocios, se comprometía a devolverla al fin del arriendo en el mismo estado en que la recibiera.

Y se alega además que el demandado en 1935 dejó la casa en las condiciones de deterioro que se especifican, causando con ello a los demandantes mil quinientos dólares de perjuicios que se ha negado a pagar.

Excepcionó la demanda el demandado y solicitó un pliego de particulares que le fué proporcionado, y contestó. Aceptó la celebración del contrato de arrendamiento con las especificaciones referidas en la demanda, pero sostuvo que dicho contrato no regía en 1935. Negó que dejara la casa en las condiciones que dicen los demandantes y como defensas especiales reprodujo su excepción de falta de hechos determinantes de una buena causa de acción y alegó, en resumen, que la casa se devolvió en las mismas condiciones en que se le entregara salvo lo que pereció o menoscabó por la acción del tiempo y el ciclón de San Felipe, habiéndose negado el dueño a repararla, teniendo el demandado que desocuparla por inservible para su negocio.

Fué el pleito a juicio y, después de comenzar, con el allanamiento del demandado, los demandantes enmendaron su demanda para conformarla a la prueba. Insistió el demandado en su excepción y archivó una contestación enmendada. Finalmente el pleito se resolvió por sentencia condenando al demandado a pagar a los demandantes ochocientos dólares por daños y perjuicios, más las costas y doscientos dólares por honorarios de abogado y el demandado interpuso el presente recurso de apelación.

Cinco errores señala el apelante en su alegato como cometidos por la corte de distrito al desestimar su excepción previa, al no permitirle presentar evidencia en relación con sus defensas especiales, al permitir a los demandantes que pre-

sentaran evidencia sobre hechos no alegados en su contestación, al dictar sentencia basada en prueba insuficiente y al imponer las costas y honorarios al demandado y fijar los honorarios en doscientos dólares.

Examinemos el primer error. La excepción de falta de hechos determinantes de la causa de acción ejercitada alegada primero con respecto a la demanda, se reprodujo después de practicada la prueba. Se funda principalmente en que las cláusulas del contrato de arrendamiento celebrado en 1922 para vencer en 1925, no regían en 1935.

La celebración del contrato está admitida. También que dicho contrato contenía las siguientes cláusulas:

"*Primera:* Don Manuel León Parra, como apoderado de Don Guillermo León Parra, da en arrendamiento a Don Juan José Gerardino y Maldonado, la finca descrita y sus pertenencias, por un término de TRES años, a contarse desde el día primero de octubre actual, para terminar el treinta de septiembre de mil novecientos veinte y cinco; mediante el canon de CUARENTA DOLLARS pagaderos por meses vencidos en esta ciudad en el domicilio del señor León, contra recibos privados.

"*Segunda:* El edificio arrendado estaba dedicado actualmente a vivienda de familia, pintado de aceite, con sus puertas persianas, plafones y demás obras interiores necesarias, tales como cocina, inodoro, fregaderos e instalaciones sanitarias y de luz, en cuya forma lo ha recibido el señor Gerardino.

"*Tercera:* Habiendo el señor Gerardino alterado las condiciones interiores de la casa para exigencias de su negocio, queda comprometido a reponer dicha casa a la terminación de este arrendamiento, en condiciones de servir de habitación a familias; por consiguiente, restaurará las puertas persianas que dan a la calle, cuyas persianas él ha quitado sustituyéndolas por cristales; retirará las tablillas que él ha puesto en las paredes interiores de la casa, reparando todos los agujeros de clavos y de otra índole que por la clase de esta obra ha realizado en dicha casa, tanto en las paredes como en el piso y plafón de la misma, debiendo dejar pintado cada departamento de la casa en la misma forma y clase de pintura que hoy tiene, esto es, habitaciones que actualmente están pintadas de aceite, lo serán de igual clase de pintura, y de la misma manera las que se hallan pintadas de agua o al temple; y en una palabra, cuanta alteración haya

realizado en la casa en cuestión, será por él corregida en forma de que quede en el mismo estado y ser que hoy tiene; todo ello a gusto y aprobación del señor León Parra, y por cuenta del señor Gerardino.''

Y de igual modo está admitido que a la terminación del contrato el arrendatario continuó en la posesión de la casa con el consentimiento del arrendador, rebajándose el canon mensual del arrendamiento a treinta dólares en 1930 y a veinte y cinco en 1932.

El arrendador sostiene que de esos hechos y de lo dispuesto en la ley surge la prórroga del contrato en las mismas condiciones en que fué celebrado, con las solas modificaciones parciales referentes al canon, y la corte sentenciadora le dió la razón. El arrendatario alega que el contrato no fué prorrogado si que novado y por tanto que las cláusulas del mismo que se invocan no regían cuando la casa fué entregada en 1935.

El contrato de arrendamiento está ampliamente regulado por la ley. Todo el título sexto del libro cuarto del Código Civil le está dedicado. Comprende desde el art. 1432 hasta el 1495, ed. 1930. El 1456 dispone:

''Artículo 1456.—Si al terminar el contrato permanece el arrendatario disfrutando quince días de la cosa arrendada con aquiescencia del arrendador, se entiende que hay tácita reconducción por el tiempo que establecen los artículos 1467 y 1471, a menos que haya precedido requerimiento.''

Los artículos 1467 y 1471 que cita se refieren el primero al arrendamiento de predios rústicos que no está aquí envuelto y el segundo a que si no se hubiese fijado plazo al arrendamiento. se entenderá hecho por años cuando se ha fijado un alquiler anual, por meses cuando es mensual y por días cuando es diario.

La única otra medida expresa que se encuentra en la ley con respecto a la tácita reconducción, es que cesan respecto

de ella las obligaciones otorgadas por un tercero para la seguridad del contrato principal. No tiene aplicación a este caso.

Refiriéndose al significado y alcance de disposiciones iguales del Código Civil Español a las que dejamos citadas, se expresa el comentarista Martínez Ruiz, como sigue:

"Si el arrendamiento se ha hecho por tiempo *determinado,* dice textualmente el artículo 1565, concluye el día prefijado sin necesidad de requerimiento. ¿Es esto exacto? Si lo fuera, se impondrían dos consecuencias: que hay arrendamientos por tiempo indeterminado y que para su terminación es necesario el previo requerimiento; afirmaciones que pugnan abiertamente con los preceptos fundamentales que rigen este contrato. Según la definición del artículo 1543, la determinación del tiempo de duración del arrendamiento de cosas, que es el de que se ocupa este Capítulo, es un requisito esencial del contrato, hasta tal punto indispensable que, si no aparece señalado por los contratantes, lo fija la ley, entendiéndose hecho, cuando se trata de predios rústicos, por todo el tiempo necesario para la recolección de los frutos que toda la finca arrendada diere en un año o pueda dar por una vez, aunque pasen dos o más años para obtenerlos; y tratándose de predios urbanos, por años, meses o días, cuando se hubiere fijado un alquiler anual, mensual o diario; y así lo confirma el artículo 1569 al conceder al arrendador derecho para desahuciar judicialmente al arrendatario, por haber expirado el término convencional o los fijados por la ley, de que acabamos de hacer mención. El plazo del arrendamiento es, por consiguiente, siempre determinado; lo fijan las partes *señaladamente,* o lo fija la ley, a falta de pacto expreso; y, en ambos casos, termina el contrato a la expiración de estos respectivos plazos, sin necesidad de requerimiento.

"¿A qué requerimiento, pues, alude el artículo 1565? La contestación se encuentra, a nuestro juicio, en el artículo siguiente, indudable excepción de la regla general que aquél establece, y según el cual, si al terminar el contrato permanece el arrendatario disfrutando quince días de la cosa arrendada, con acquiescencia del arrendador, se entiende que hay tácita reconducción por el tiempo que establecen los artículos 1577 y 1581. De suerte que el arrendamiento termina *ipso facto* por la expiración del plazo, a no ser, y ésta es la excepción, que se produzca la reconducción tácita por la

permanencia del arrendatario en el disfrute de la cosa con el consentimiento del arrendador; pero, como este consentimiento es presunto, se deriva de su silencio y tolerancia en el hecho de la posesión del arrendatario sobre la cosa objeto del contrato, se necesita algún acto que desvirtúe aquella presunción, y este acto es el requerimiento hecho al arrendatario para que dé el contrato por terminado.

"De aquí se deduce que la tácita reconducción no es un nuevo contrato, sino una prórroga del primitivo, cuya extinción se suspende por el consentimiento tácito de los contratantes, no por un nuevo término fijado de común acuerdo, en cuyo caso deberá calificarse de nuevo contrato, como producto que será de nueva convención, sino por el tiempo que la ley fija, a falta de pacto expreso, para la conclusión de los arrendamientos de predios rústicos y urbanos.

"No conforme con este criterio, sostiene un reputado comentarista (Manresa, tomo X) que la permanencia del arrendatario en el disfrute de la cosa no significa la permanencia del arrendamiento, el cual concluye el día prefijado sin necesidad de requerimiento, no siendo posible que lo que ha concluído se pueda prorrogar ni pueda subsistir; y explica la necesidad del requerimiento como medio de que, supuesta la permanencia en el disfrute, no se entienda que nace de aquella permanencia un nuevo contrato de arrendamiento, cuyo único origen sería el consentimiento tácito de las partes. Pero añade a continuación que las relaciones jurídicas creadas por la tácita reconducción se regirán por lo pactado en el contrato que a la reconducción da lugar; lo cual implica que el contrato no ha concluído, que no ha dejado de existir, que sigue surtiendo todos sus efectos y siguen rigiendo todas sus cláusulas y condiciones, excepto la referente al tiempo de su duración que, por consentimiento tácito, queda prorrogado. ¿En qué título, sino en el que representa el contrato prorrogado, fundaría, de otro modo, el arrendador las acciones que contra el arrendatario se vea precisado a ejercitar durante el tiempo de la reconducción? El Código mismo confirma en los artículos de que nos ocupamos que la tácita reconducción, lejos de constituir un contrato independiente, implica una excepción del precepto general que da por terminado el arrendamiento por el solo hecho del transcurso del término convencional o del supletorio fijado por la ley. . . . .

"El Tribunal Supremo, además, ha consignado en los Considerandos de dos de las sentencias que a continuación se insertan, que 'el artículo 1566 claramente expresa que el término de la *prórroga*

ha de ser el establecido en los artículos 1577 y 1581', y que el plazo que señala el Código para que se entienda que hay tácita reconducción, 'sólo produce el efecto de *prorrogar* el arrendamiento cuando no hubiese precedido requerimiento para su terminación.' "
9, Martínez Ruiz, El Código Civil, pág. 573.

El comentario es claro y terminante. Contiene a nuestro juicio el verdadero significado y alcance de la ley. Y aplicada la ley a los hechos de este caso se concluye que el contrato de arrendamiento de 1922 quedó prorrogado por el acto del arrendatario y el consentimiento del arrendador en los mismos términos en que fué otorgado, excepción hecha del relativo a su vencimiento que quedó sustituído por el precepto legal.

¿Fué luego novado por la reducción del canon mensual pactado? Creemos que no.

Las obligaciones se extinguen, dice el artículo 1110 del Código Civil, ed. 1930, por el pago o cumplimiento, por la pérdida de la cosa debida, por la condonación de la deuda, por la confusión de los derechos de acreedor y deudor, por la compensación y por la novación.

Es, pues, la novación uno de los medios de extinción de las obligaciones, pero a nuestro juicio el contrato de arrendamiento celebrado en 1922 y prorrogado por tácita reconducción en 1925, no fué novado en 1930 y 1932 porque se rebajara el canon mensual estipulado.

Para que una obligación quede extinguida por otra que la sustituya, ordena el artículo 1158 del Código Civil, ed. 1930, es preciso que así se declare terminantemente, o que la antigua y la nueva sean de todo punto incompatibles. Y aquí nada se dijo expresamente, ni las obligaciones son en lo más mínimo incompatibles. Es la misma obligación modificada en cuanto a uno de sus extremos por la voluntad de las partes contratantes. El contrato continuó, sólo que en vez de pagarse cuarenta dólares mensuales de alquiler como al prin-

cipio, se pagó a partir de 1930 treinta y a partir de 1932 veinte y cinco. Eso es todo. El error señalado no fué, pues, cometido.

■■ Alterando el orden del señalamiento de los errores, procederemos al estudio del tercero que envuelve la fijación del alcance que tiene un pliego de particulares.

En la demanda se alega:

"7. Que el demandado al dejar el 19 de noviembre del año en curso la posesión como arrendatario de la referida casa ha dejado los plafones de la misma y los quicios de las puertas con innumerables rotos producidos por clavos; muchas puertas sin sus picaportes y pestillos, las pinturas y el revocado de las paredes, tanto interiores como exteriores, intensamente deterioradas con grandes manchones de argamasa por haber sido revocados algún agujero en la pared, y en otros sitios aparece en parte la pintura con que se cubría ésta primitivamente y el resto de la habitación de otro color, por haberse, según información y creencia de los demandantes, aplicado la pintura por el demandado o por su orden, sin remover algún mueble que descansaba contra la pared en que se aprecia tal duplicidad de colores; y al dejar la casa el demandado y retirar el mueble de referencia aparece entonces el defecto que decimos: en otras de las paredes interiores se observa profusamente manchas de tinta de escribir. Los pisos de las habitaciones están podridos y hundidos, y rotas gran número de las vigas que sustentaban aquél. Las paredes de la cocina y fogón cuajados de desconchados y falta de los hornillos correspondientes. Uno de los inodoros ha dejado de ser sanitario, ofreciendo un aspecto repulsivo a la vista y olfato y el otro de los dos que tenía la casa no existe por haberlo destruído el demandado. El piso del patio está hundido a trechos y el baño de la casa y sus losetas que lo revisten destrozadas.

"8.—Que los demandantes tan pronto el demandado desocupó la referida casa requirieron a éste repetidas veces para que procediera a corregir estos daños, no haciéndoles caso el demandado y dejando sin remediar los daños referidos en la alegación anterior.

"9.—Que como consecuencia de la conducta del demandado los demandantes han sufrido daños y perjuicios por la culpa y negligencia del demandado que estiman en la suma de $1,500, que no ha sido satisfecha a los demandantes ni en todo ni en parte ni por el demandado ni por ninguna otra persona."

Pedido un pliego de particulares, se suministró como sigue:

"El demandante por conducto de su abogado Raúl Matos, responde a la moción sobre especificación servida en el caso del epígrafe, y los especifica en la forma siguiente: Instalación sanitaria con acometimiento de alcantarillado: $200. Rehacer la cocina con 4 hornillas y montar un fregadero: $40. Reparar 15 puertas con sus quicios a $5: $75. Reparar 2 ventanas a $7.50: $15. Reparar plafones: $15. Montar un inodoro nuevo en restitución de uno que había y desapareció: $25. Arreglo del inodoro actual: $15. Arreglo baño actual: $20. Montura de todo el piso del edificio de tabloncillo de 1¼" × 4" y viguería correspondiente, alrededor de 105 mc. a $3: $315. Montar un portón incluyendo sus herrajes: $50. Coger desconchado a todo el edificio: $25. Pintar todo el edificio interior y exterior a 3 manos, alrededor de 726 mc. a $0.50: $363. Pavimentación piso del patio: $12. Prima indemnización a obreros: $30. Total: $1,200. Pérdida de cánones por inhabilitación: $300. Total: $1,500."

Cuando en el acto del juicio los demandantes presentaron evidencia sobre el portón, sobre la prima de indemnización a obreros y sobre las rentas dejadas de percibir, el demandado se opuso porque la demanda no contenía las alegaciones correspondientes. Sostuvieron los demandantes que si bien no constaban específicamente en la demanda, aparecían del pliego de particulares presentado a solicitud del propio demandado. Insistió éste en su oposición y la corte dió la razón a los demandantes.

La naturaleza y función de un pliego de particulares se encuentran bien expresados en el siguiente párrafo de Corpus Juris que contiene la substancia de gran número de decisiones de los tribunales. Dice:

"El pliego de particulares es propiamente una ampliación de una alegación (pleading) y su objeto es hacer más específicas las alegaciones generales que aparecen en esta última y evitar sorpresa en el momento del juicio. La misión del pliego de particulares es hacer justicia en el caso cuando tal cosa no puede lograrse sin la ayuda de tal pliego, y esto es enterar a la parte contraria en rela-

ción con el caso al cual tiene que enfrentarse. Por tanto, la adecuada finalidad del pliego de particulares es informar a la parte contraria y a la corte en relación con la verdadera naturaleza y características de la causa dè acción o defensa alegada por la parte en relación con cualquier hecho relevante del caso que no ha sido específicamente expuesto en sus alegaciones y el cual no es posible, en muchos casos, expresar en las alegaciones sin gran prolijidad. Además, se ha sostenido que la función del pliego de particulares es ayudar a la corte lo mismo que a las partes, a acelerar el juicio o aclarar, definir o limitar los hechos litigiosos del caso. No es la misión del pliego de particulares suplir alegaciones pertinentes necesarias a la validez de una alegación ni cambiar una causa de acción o defensa expuesta en la alegación, o alegar causa de acción o defensa distinta a la que ha sido aducida. Ni tampoco es el propósito de tal pliego suministrar al demandado hechos sobre los cuales pueda basar una defensa afirmativa o que constituyan una defensa o recovención para la otra parte.'' 49 C. J. 622 a 624.

Véanse también nuestras decisiones en *Rivera* v. *Vahamonde,* 57 D.P.R. 810; *Colón* v. *Shell Co. (P.R.) Ltd.,* 55 D.P.R. 592, 621; *García* v. *Aguayo,* 46 D.P.R. 340; *Drug Co. of P. R., Inc.* v. *Susoni,* 43 D.P.R. 772; *Berio* v. *Rivera,* 42 D.P.R. 460; *Santiago* v. *Cuevas Padilla,* 41 D.P.R. 116; *Molina* v. *Rodríguez,* 40 D.P.R. 690; *J. Thomas & Co.* v. *Florido,* 40 D.P.R. 1.

Examinados la demanda y el pliego, puede verse que si bien los particulares de referencia hechos constar en el pliego no aparecen específicamente en la demanda, forman parte de la misma transacción, esto es, emanan de la misma causa de acción ejercitada. No se varió, pues, a virtud de ellos la naturaleza del pleito y el demandado tuvo suficiente aviso para preparar su defensa. Dentro, en tal virtud, de una interpretación liberal de la ley, no creemos que podamos concluir que se cometiera error por la corte al permitir la evidencia.

Examinemos el segundo error. Se basa en que la corte no permitió al demandado presentar cierta evidencia en relación con sus defensas especiales.

Consta de los autos que al declarar el perito del demandado, Hipólito Fitzpatrick, ocurrió lo que sigue:

"¿De qué era el piso de esa casa?

"En parte, cuando podía apreciar, cuando iba, se que es de madera.

"¿Qué clase de madera?

"De pichipén.

"¿Cuánto dura un piso de madera de pichipén?

"Hernández: Nos oponemos.

"Gadea: Nos oponemos.

"Hernández: El *ruling* de la corte es que aquí hay dos cosas, una, el estado en que estaba la casa, y, otra, las obligaciones que asumió Gerardino en el contrato. Cuando declaraba el perito Serra, a una pregunta del compañero de que cuánto tiempo duraban tales vigas, se estableció el *ruling* de que no se podía preguntar sobre eso.

"Colón: Hay una defensa especial de 'que el demandado al entregar la casa a los demandantes, lo hizo en las mismas condiciones en que la recibió, salvo lo que pereció o menoscabó, por la acción del tiempo y por los daños que sufrió dicha casa en el ciclón conocido por "San Felipe" que tuvo lugar en está Isla, en el mes de septiembre de 1928, y que si algún deterioro o pérdida sufrió la casa arrendada, fué sin culpa del demandado, pues éste usó la misma como un diligente padre de familia.' Nosotros tenemos esa defensa especial y tenemos que probarla.

"Juez: Con lugar la objeción.

"Colón: Tomamos excepción, señor juez.

"La misma pregunta vamos a hacerla en cuanto a la pintura.

"¿Una pintura exterior de aceite, cuánto dura?

"Testigo: ¿De aceite?

"Hernández: Con nuestra objeción.

"Juez: Con lugar la objeción.

"Colón: Con nuestra excepción.

"¿Las vigas de pichipén cuánto duran?

"Hernández: Con nuestra objeción.

"Juez: Con lugar.

"Colón: Tomamos excepción."

A nuestro juicio la negativa de la corte estuvo bien fundada en cuanto a la pintura, porque de acuerdo con los claros

términos del contrato debía ésta reponerse, pero no lo estuvo en cuanto a la duración del piso y de las vigas.

Las cláusulas del contrato deben interpretarse en armonía con lo dispuesto en el artículo 1451 del Código Civil, ed. 1930, a saber:

"El arrendatario debe devolver la finca, al concluir el arriendo, tal como la recibió, salvo lo que hubiese perecido o se hubiera menoscabado por el tiempo o por causa inevitable."

Dichas cláusulas no obligan a renovar la casa. Deben cumplirse sí en su letra y en su espíritu, pero interpretadas de acuerdo con los hechos y la ley. Una viga o un piso que se desgastan por el transcurso del tiempo, que duran todo lo que pueden durar, no tendrían que ser reemplazados de acuerdo con las cláusulas.

La prueba era en tal virtud pertinente y debió admitirse para ser considerada por sus méritos a los fines de la fijación definitiva de los daños y perjuicios. El error fué cometido.

El cuarto error levanta la cuestión de la suficiencia de la prueba. Al sostener que no lo es, pone el apelante el mayor énfasis en la manera cómo declaró el perito que presentaron los demandantes para demostrar en gran parte la cuantía de los daños, transcribiendo de su declaración lo que sigue:

"¿Cuántos quintales de pintura se gastarían en pintar dicha casa interiormente?

"Esa nota no la tengo yo; yo sé que el total me dió. . . .

"¿Qué dimensiones tiene esa casa por dentro, usted que es ingeniero o arquitecto?

"No recuerdo ahora. No tengo las notas a la mano.

"¿No sabe las dimensiones por dentro?

"Yo las tengo en mis notas, pero no las tengo aquí.

"Por fuera, ¿qué dimensiones tiene?

"No tengo las notas encima.

"¿Tampoco lo puede saber?

"No recuerdo. Yo podría decir si revisara mis notas. (Trans. de evidencia, pág. 81.)

"¿Usted, como arquitecto, sobre instalación sanitaria, usted compra plomería, tubería?

"No, señor. Yo no compro materiales.

"¿Inodoros compra?

"No, señor.

"¿Cuántos pies de tubería hay que montar ahí?

"Yo lo tengo en mis notas, pero no tengo detalles aquí. (Trans. de evidencia, pág. 82.)

"¿Cuánta madera hay que comprar para reparar esas dos ventanas?

"Tampoco puedo recordarme de eso. Eso fué el año pasado, en junio. Yo tomé esas notas y saqué el estimado. (Trans. de evidencia, pág. 87.)

"¿Usted dijo que hay que reparar el plafón? ¿Qué reparación hay que hacerle en el plafón?

"Testigo: Hay que cambiarlo, digo, cambiarle algunas tablas, tapar un sinnúmero de boquetes que tiene, rotos.

"¿Cuántas tablas hay que cambiar?

"Yo no puedo recordar eso.

"¿Cuántos agujeros hay que reparar en el plafón?

"Tampoco puedo especificarlo. (Trans. evidencia, pág. 88.)

"¿Cuántas losetas hay que comprar para arreglar ese baño?

"Testigo: No tengo la nota aquí. No puedo decirle cuántas losetas; únicamente puedo decirle el precio, del resultado de aquellas notas.

"Juez: ¿Pero usted tiene esas notas, que pudiera traerlas?

"Yo creo tenerlas.

"Colón: Usted las tiene hechas.

"Sí.

"¿En su oficina?

"Sí.

"¿Usted las puede pedir por teléfono?

"No, señor, no tengo a nadie en mi oficina.

"¿Usted podría irla a buscar y traerlas dentro de 5 ó 10 minutos?

"No, señor.

"¿Por qué no puede?

"Yo tenía la oficina montada en la calle Sol y la trasladé a mi casa, y todo eso está en cajones. Al colocarme en la reforestación, recogí todo eso y eso sería cuestión de buscar ahora. (Trans. de evidencia, pág. 89.)

"Juez: La parte tiene derecho a que usted detalle. ¿Usted podría hacer un detalle de esas notas de nuevo?

"Sí, yo podría hacerlas de nuevo.

"Colón: Yo aceptaría que la corte le diera un tiempo razonable, media hora por ejemplo, para buscar o rehacer esas notas.

"Juez: Ya ha dicho que desde que está colocado en la reforestación tiene todos sus papeles en cajones y tiene que buscarlos. Ahora, el valor que tenga la declaración sin detalles, eso va al peso que pueda tener la prueba en el caso. (Trans. de evidencia, pág. 90.)"

En su relación del caso y opinión, la corte sentenciadora resume las alegaciones, se refiere al juicio y transcribe integra el acta de inspección ocular de la casa en cuestión que contiene una descripción amplia y minuciosa del estado en que la corte la encontrara. Entonces dice:

"La corte, por la apreciación que ha hecho de toda la prueba presentada y admitida, y especialmente por el resultado de la inspección ocular efectuada por el juez, considera que los demandantes han probado satisfactoriamente las alegaciones de su demanda, y, especialmente, las alegaciones contenidas en el hecho séptimo de la misma, supra, en cuanto al estado en que dejó la casa el demandado al cesar en su arrendamiento. Se ha probado, a satisfacción de la corte, que dicha casa estaba en buen estado para ser ocupada como residencia cuando le fué arrendada al demandado y que ha sido por el uso a que la destinó el demandado durante los años en que la ocupó, o sea, como establecimiento comercial de efectos eléctricos, que se han causado la mayor parte de los daños y deterioros que se describen en el acta de la inspección ocular. La casa ha quedado inservible para ser alquilada como casa residencia por no haber el demandado hecho las reparaciones necesarias en la misma antes de entregarla a los demandantes al desocuparla. Se ha probado además, que el demandante, Sr. M. León Parra, realizó cuantos arreglos en la casa le fueron solicitados por el demandado en el transcurso de los años en que estuvo arrendada.

"La corte es de opinión que los daños y deterioros antes mencionados no han sido causados por la acción del tiempo o por causa inevitable, con la posible excepción de algunas de las tablas de los pisos de la casa y del portón que se ha descrito en el acta de la inspección ocular.

"En cuanto a lo que costaría reparar la casa para dejarla nuevamente en forma adecuada para ser habitada como residencia, el testigo de los demandantes, Sr. Serra Gaztambide, arquitecto, declaró que había hecho un estimado de dicho costo y lo detalló en la forma siguiente: Instalación sanitaria: $125. Reparar la cocina y fregadero: $60. Reparar las quince puertas: $40. Reparar dos ventanas: $15. Reparar los plafones: $15. Reparar baño azulejos: $40. Reparar piso y viguería: $260. Poner portón nuevo: $50. Coger todos los desconchados: $75. Pintura interior y exterior: $275. Total: $955.

"Aunque no hay duda de que el testigo Sr. Serra Gaztambide, hizo el estimado antes mencionado en el mes de junio de 1936, al declarar no tenía en su poder las notas que tomó cuando visitó la casa y tampoco pudo especificar con exactitud los precios de los materiales que se requerirían para hacer las distintas reparaciones, y que pudieran convencer a la corte de la exactitud del costo individual y total que él le dió a las distintas reparaciones. Tomando en consideración toda la declaración del testigo, en conjunto y el hecho indiscutible del estado deplorable en que está la casa, la corte es de opinión que el costo de las reparaciones necesarias para ponerla de nuevo en condiciones habitables para fines de residencia de una familia, no bajará de la suma de $500. Al fijar esta suma, la corte ha tomado en consideración además cualquier deterioro que haya podido ser causado en la casa, especialmente los pisos, portón y pintura, por la acción del tiempo o por causas inevitables.

"Se ha probado además, que la casa no ha podido ser alquilada para fines de residencia desde que la dejó el demandado el 19 de noviembre de 1935, y los demandantes reclaman la suma de $300 por pérdida de cánones de arrendamiento que han dejado de percibir, a razón de $25 mensuales que era el canon de arrendamiento último del demandado. La corte considera razonable la reclamación ya que dichos $300 sólo cubren doce meses y dicha casa lleva más de año y medio sin poder ser alquilada por el estado en que la dejó el demandado."

Impugnando el error los apelados citan el caso de *José Romaguera & Co.* v. *M. Castro & Co.*, 16 D.P.R. 428, en el cual esta corte resolvió que:

"Cuando hay diversos elementos probatorios, que apreciados en conjunto han servido al juzgador para formar juicio sobre los hechos

debatidos en el pleito, no es posible que un tribunal de apelación divida esos elementos para considerarlos aisladamente, teniendo en cuenta unos, y prescindiendo de otros, pues siempre debe presumirse que un tribunal ha apreciado debidamente las pruebas, mientras no se demuestre lo contrario; y esa demostración contraria, ha de resultar de todas las pruebas practicadas, y no de algunas de ellas solamente.''

Pero aquí la situación es distinta. En el caso de *Romaguera,* supra, no se encontraba ante ese tribunal de modo fehaciente toda la prueba practicada mientras que aquí se encuentra. El apelante en este caso sostiene la insuficiencia no sólo de la declaración de Gaztambide si que de la totalidad de la evidencia aportada por los demandantes para probar la cuantía de los daños.

Otro de los casos de esta corte invocado con igual propósito por los apelados es el de *Díaz* v. *The San Juan L. & T. Co.,* 17 D.P.R. 69, 78, en el cual esta corte citó a Bouvier como sigue:

"Veamos ahora lo que es necesario alegar y probar en esta clase de casos.

'' 'En acciones personales y mixtas (mas no en acciones penales, por razones obvias), la demanda debe alegar, en conclusión, que el daño es en perjuicio del demandante, y debe especificar el montante de los daños y perjuicios; Com. Dig. Pleader (c, 84) ; 10. 116 b.

  *   *   *   *   *   *   *

'' 'Para constituir un derecho a recobrar daños y perjuicios, la parte que reclame dichos daños y perjuicios tiene que haber sufrido pérdidas; la parte a quien se le reclaman debe ser susceptible· de culpa; las pérdidas deben ser la consecuencia natural y próxima del acto culpable.

'' 'No existe derecho a daños y perjuicios, propiamente denominados, cuando no existen pérdidas. La cantidad impuesta como multa al culpable, sencillamente como castigo por su culpa, independientemente de cualesquiera pérdidas por ella causadas, es una "multa" o "penalidad," más bien que daños y perjuicios. Los daños y perjuicios se fundan en el concepto de pérdidas que hay que resarcir, de un daño que hay que reparar; 11 Johns, 136; 2 Tex., 460; 11 Pic., 527; 15 Ohio, 726; 3 Sumn., 192; 4 Mass.,

115; 91 Pa., 302; 104 Mass., 353; 16 Q.B.D., 613; See 142 N. Y. 391; Hale Dam., 3. Estas pérdidas, sin embargo, no tienen necesidad siempre de ser precisas y definidas, susceptibles de una descripción exacta o de ser computadas en pesos y centavos. Pérdidas suficientes para sostener una acción pueden desprenderse de la mera naturaleza del caso mismo. La ley en muchos casos presume pérdidas cuando se prueba un daño intencionado (*wilful wrong*); y así también se conceden daños y perjuicios por sentimientos ultrajados, dolor corporal (físico), dolor moral, daño a la reputación, y por otros sufrimientos que sería imposible sujetar a una prueba y a un cómputo exactos, en cuanto al montante de las pérdidas sufridas; 2 Day, 250; 3 H. & M. H., 510; 5 Ired., 545; 3 Humphr., 140; 15 Conn., 267; 8 B. Monr., 432; 94 Mich., 119; 112 N. C., 323; 39 Ill., App., 495; 82 Tex., 33. La regla no es que las pérdidas deban probarse por la evidencia, sino que deben desprenderse de la evidencia o aparecer por presunción, fundándose en la naturaleza del caso.' 1 Bouvier's Law Dic., 492.''

La cita contiene la correcta exposición de la ley sobre la materia. Los apelados ponen énfasis en la parte que dice, ''Estas pérdidas sin embargo no tienen necesidad de ser siempre definidas y precisas, susceptibles de una descripción exacta o de ser computadas en pesos y centavos.'' Y en verdad esa parte es la menos aplicable a los hechos de este caso.

Aquí se trata de daños específicos a la propiedad que pudieron describirse y justipreciarse en pesos y centavos como se describieron y justipreciaron en la demanda y el pliego de particulares y la evidencia debió corresponder a la alegación y al pliego.

Que se ocasionaron daños, es evidente, y que el demandado está obligado a resarcir el perjuicio que causara, evidente es también. La que no resulta evidente es la cuantía de los daños, porque la declaración de Gaztambide, única prueba al efecto presentada, no constituye la base sólida que se requiere para fundar una conclusión precisa sobre el particular. La inspección ocular es prueba de la existencia de los daños, pero no del montante de los mismos en pesos y

centavos. La conclusión a que llegó, pues, la corte para fijar la partida de quinientos dólares no encuentra apoyo en los autos.

■ Tampoco está bien fundada en su totalidad la partida de trescientos dólares por alquileres dejados de percibir durante un año, período demasiado largo bajo la regla de la mitigación de daños. ° Véanse *Ortiz* v. *McCormick Steamship Co.*, 57 D.P.R. 560. Sólo cabría conceder aquéllos dejados de percibir durante el período de tiempo razonablemente necesario para las gestiones cerca del demandado requiriéndolo al cumplimiento de su deber y para realizar la obra de la reparación.

El cuarto error fué cometido y como consecuencia del mismo y del segundo, el quinto, que se refiere a la imposición de costas y honorarios.

Ahora bien, ¿debe revocarse la sentencia y declararse la demanda sin lugar o revocarse ordenándose la celebración de un nuevo juicio?

Nos parece que dadas las circunstancias que concurren, la indudable existencia de los daños y la clara obligación de resarcirlos, la más justa es la última solución. Así las partes tendrán una nueva oportunidad de presentar su prueba sobre la cuantía de los daños y la corte la de dictar una sentencia que los fije con exactitud.

*Se revoca la sentencia y se ordena la celebración de un nuevo juicio de acuerdo con los principios establecidos en esta opinión.*

El Juez Asociado Sr. Todd, Jr., no intervino.